**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MICHAEL J. CAPOZZOLI and LEE NAPIER, | Civil Action |
| Plaintiffs, | No. 1:20-cv-04992-RMD-AMD |
| v. | |
| CUMULUS MEDIA HOLDINGS, INC., WESTWOOD ONE, LLC, TM STUDIOS, INC., WILLIAM G. CLANCY, AND KIRK STIRLAND, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS .....................................................................................2

    A.    Westwood One's TM Studios Division ........................................................2

    B.    Affiliate Sales In The TM Studios Division.................................................2

    C.    Cumulus' Employee Handbook.....................................................................3

    D.    Plaintiffs' Employment In Westwood One's TM Studios Division ....................4

    E.    The TM Studios Division Launches A Critical New Product: TM EVO .............5

    F.    Plaintiffs Fell Short Of Their Performance Goals .................................7

    G.    Plaintiffs Were Terminated As Part Of The TM Studios Division's Planned Reduction In Force ...........................................................................10

III.   STANDARD FOR SUMMARY JUDGMENT ..............................................13

IV.    LEGAL ARGUMENT...........................................................................................14

    A.    Westwood Is Entitled To Summary Judgment As To Counts I And III Of The Complaint Because Plaintiffs Cannot Establish That Any Of The Defendants Discriminated Against Them Because Of Their Age......................14

        1.    Plaintiffs Were Not Terminated Under Circumstances Giving Rise To An Inference of Discrimination ........................................16

        2.    Mr. Napier Is Not Entitled To Relief Under The NJLAD Because He Is A Resident of South Carolina ......................................21

    B.    Westwood Is Entitled To Summary Judgment As To Counts II And IV Of The Complaint Because Plaintiffs Cannot Establish That Any Of The Defendants Retaliated Against Them ................................................................22

        1.    Mr. Capozzoli Did Not Engage In Protected Activity ............................22

        2.    No Causal Link Exists Between Plaintiffs' Alleged Protected Activities And Plaintiffs' Terminations.................................................24

    C.    Plaintiffs Were Terminated As Part Of A Legitimate, Non-Discriminatory Business Reorganization Devoid Of Pretext......................................................27

V.     CONCLUSION .....................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Abrams v. Lightolier, Inc.*,
   841 F. Supp. 584 (D.N.J. 1994) *aff'd*, 50 F.3d 1204 (3d Cir. 1995)....................................15

*Anderson v. Consol. Rail Corp.*,
   297 F.3d 242 (3d Cir. 2002) ............................................17

*Ayres v. MAFCO Worldwide LLC*,
   Civ. No. 2020 U.S. Dist. LEXIS 130131 (July 23, 2020) ....................................22

*Bleistine v. Diocese of Trenton*,
   914 F. Supp. 2d 628 (D.N.J. 2012) ................................19

*Bray v. Marriott Hotels*,
   110 F.3d 986 (3d Cir. 1997) ............................................27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................14

*Chaffee v. Kraft Gen. Foods, Inc.*,
   886 F. Supp. 1164 (D.N.J. 1995) ............................................14

*Chambers v. Hidelberg USA, Inc.*,
   No. 04–583 (RBK), 2006 U.S. Dist. LEXIS 32334 (D.N.J. May 5, 2006) ...........................16

*Chapman v. Am. Inst. of Certified Pub. Accts.*,
   No. Civ. A. 03-3692 (WHW), 2005 WL 2620191 (D.N.J. Oct. 13, 2005),
   *aff'd*, 233 F. App'x 141 (3d Cir. 2007) ................................14

*Deville v. Givaudan Fragrances Corp.*,
   419 F. App'x 201 (3d Cir. 2011) ............................................22

*Doe v. Bd. of Educ. of Vocational-Tech. Sch. Dist. in Cty. of Gloucester*,
   No. CV 17-13793 (RBK/JS), 2019 WL 2183860 (D.N.J. May 21, 2019) ...........................13

*Dooley v. Roche Labs, Inc.*,
   Civ. No. 04-2276 (GEB) 2007 U.S. Dist. LEXIS 10467 (Feb. 15, 2007)............................23

*Duffy v. Paper Magic Group, Inc.*,
   265 F.3d 163 (3d Cir. 2001) ............................................16

*El v. Se, Pennsylvania Transp. Auth. (SEPTA)*,
   479 F.3d 232 (3d Cir. 2007) ............................................17

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Farmer v. Camden City Bd. of Educ.*,
   Civ. No. 03-685 (JBS) 2005 U.S. Dist. LEXIS 7339 (Mar 28, 2005) ..................................21

*Farrell v. Planters Lifesavers Co.*,
   206 F.3d 271 (3d Cir. 2000) ...........................................................................................25

*Fasold v. Just.*,
   409 F.3d 178 (3d Cir. 2005) ...........................................................................................15

*Fuentes v. Perskie*,
   32 F.3d 759 (3d Cir. 1994) ......................................................................................27, 29

*Glanzman v. Metro. Mgmt. Corp.*,
   391 F.3d 506 (3d Cir. 2004) ...........................................................................................22

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009) ................................................................................................16, 17

*Heffron v. Adamar of New Jersey, Inc.*,
   270 F. Supp. 2d 562 (D.N.J. 2003) ..................................................................................17

*Horvath v. Rimtec Corp.*,
   102 F. Supp. 2d 219 (D.N.J. 2000) ..................................................................................26

*Ianuale v. Borough of Keyport*,
   No. CV 16-9147FLWLHG, 2018 WL 5005005 (D.N.J. Oct. 16, 2018).............................13

*Jackson v. Am. Water Works Co.*,
   Civ. No. 10-3885 (RMB/JS) U.S. Dist. LEXIS 73805 (D.N.J. May 25, 2012).....................14

*Jackson v. Trump Ent. Resorts, Inc.*,
   149 F. Supp. 3d 502 (D.N.J. 2015) ..................................................................................16

*Jersey Cent. Power & Light Co. v. Lacey Twp.*,
   772 F.2d 1103 (3d Cir. 1985), *cert. denied*, 475 U.S. 1013 (1986) .....................................14

*Johnson v. Keebler-Sunshine Biscuits, Inc.*,
   214 F. App'x 239 (3d Cir. 2007) .....................................................................................15

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n.*,
   503 F.3d 217 (3d Cir. 2007) ...........................................................................................25

*Lepore v. Lanvision Sys., Inc.*,
   113 F. App'x. 449 (3d Cir. 2004)......................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Maddox v. City of Newark*,
    50 F. Supp. 3d 606 (D.N.J. 2014) ..........................................................................24

*Mahanandigari v. Tata Consulting Servs.*,
    No. 2:16-cv-08746-JLLSCM, 2017 WL 6892918 (D.N.J., Nov. 9, 2017),
    *report and recommendation adopted sub nom. Mahanandigari v. Tata*
    *Consultancy Servs.*, No. CV 16-8746 (JLL) 2018 WL 396235 (D.N.J., Jan. 11,
    2018)...................................................................................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................14

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007) ...............................................................................13

*McClement v. Port Auth. Trans-Hudson Corp.*,
    No. CIV. A. 09-522 SRC, 2011 WL 2600738 (D.N.J. June 29, 2011), *aff'd sub*
    *nom., McClement v. Port Auth. Trans-Hudson*, 505 F. App'x 158 (3d Cir.
    2012)...................................................................................................................................15

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) ..................................15, 22

*Monaco v. Am. Gen. Assur. Co.*,
    359 F.3d 296 (3d Cir. 2004) ...............................................................................17

*Sarullo v. U.S. Postal Serv.*,
    352 F.3d 789 (3d Cir. 2003) ...............................................................................16

*Seibert v. Quest Diagnostics, Inc.*,
    No. Civ. 11-304 KSH, 2012 WL 1044308 (D.N.J., March 28, 2012) ..................21

*Sgro v. Bloomberg L.P.*,
    331 F. App'x. 932 (3d Cir. 2009).......................................................................22

*Shellenberger v. Summit Bancorp, Inc.*,
    318 F.3d 183 (3d Cir. 2003) ...............................................................................24

*Showalter v. Univ. of Pittsburgh Med. Ctr.*,
    190 F.3d 231 (3d Cir. 1999) ...............................................................................16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Sporn v. Ocean Colony Condo. Ass'n,*
   173 F. Supp. 2d 244 (D.N.J. 2001) ...................................................................27

*Stasicky v. S. Woods State Prison,*
   No. 03-369 (FLW), 2006 WL 1723467 (D.N.J. June 7, 2006)..............................14

**State Cases**

*Clowes v. Terminex Int'l Inc.,*
   109 N.J. 575 (1988).............................................................................................16

*Hancock v. Borough of Oaklyn,*
   347 N.J. Super. 350 (App. Div. 2002).........................................................24, 26

*Henry v. New Jersey Dep't of Hum. Servs.,*
   204 N.J. 320 (2010).............................................................................................27

*Jason v. Showboat Hotel & Casino,*
   329 N.J. Super. 295 (App. Div. 2000)................................................................29

*Maimone v. City of Atl. City,*
   188 N.J. 221 (2006).............................................................................................24

*Norenius v. Multaler, Inc.,*
   No. A-4481-06T2, 2008 WL 4162878 (N.J. Super. Ct. App. Div., Sept. 11,
   2008)....................................................................................................................21

*Peper v. Princeton Univ. Bd. of Trustees,*
   77 N.J. 55 (1978).................................................................................................29

*Roa v. Roa,*
   200 N.J. 555 (2010).............................................................................................26

*Victor v. State,*
   203 N.J. 383 (2010).............................................................................................15

*Viscik v. Fowler Equip. Co.,*
   173 N.J. 1 (2002)................................................................................... 15, 27, 29

*Young v. Hobart W. Grp.,*
   385 N.J. Super. 385 (App. Div. 2005)................................................................24

*Zive v. Stanley Roberts Inc.,*
   182 N.J. 436 (2005).......................................................................................15, 27

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Statutes**

29 U.S.C. §§ 623, 631(a) .......................................................................................... 14

29 U.S.C. § 623(a)(1) ................................................................................................ 15

Age Discrimination in Employment Act of 1967 ("ADEA") ................................ 1, 14, 15, 19, 22

**State Statutes**

N.J. Stat. Ann. § 10:5-12(a) ..................................................................................... 14

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................. 13

## I.      INTRODUCTION

Plaintiffs Lee Napier ("Mr. Napier") and Michael Capozzoli ("Mr. Capozzoli") (collectively "Plaintiffs") claim they were terminated on the basis of their ages in violation of the Age Discrimination in Employment Act ("ADEA") and the New Jersey Law Against Discrimination ("NJLAD").  Mr. Napier further claims that his termination constituted retaliation for complaining about age discrimination, while Mr. Capozzoli alleges his termination was retaliatory because he declined to participate in a phone call regarding Mr. Napier's performance. Plaintiffs bring their federal claims against Cumulus Media Holdings, Inc., Westwood One, LLC, ("Westwood One"), and TM Studios, Inc.[1]  Plaintiffs bring their state law claims against William G. Clancy ("Mr. Clancy") and Kirk Stirland ("Stirland") (collectively with Westwood One, LLC "Defendants" or "Westwood").

Plaintiffs fail to demonstrate that they were discriminated against when they were terminated as part of a planned reduction in force.  Further, Mr. Napier offers no proof to show that his baseless complaint of age discrimination—made eleven months prior to his termination—induced the Defendants to retaliate against him by creating a pretextual business reorganization with the purpose of ousting Mr. Napier.  Similarly, Mr. Capozzoli has no evidence that his decision not to participate in an optional phone call with Mr. Napier to improve the latter's poor performance nearly a year before their terminations caused the Defendants to retaliate against him in any way whatsoever.  Simply put, Mr. Napier and Mr. Capozzoli were terminated because of a legitimate business decision devoid of discriminatory animus.  Therefore, this Court should grant Defendants' Motion for Summary Judgment.

---

[1] Plaintiffs incorrectly identify Cumulus Media Holdings, Inc. and TM Studios, Inc. as defendants, though neither is an existing corporate entity nor a proper defendant.  Westwood One, LLC was Plaintiffs' employer.

## II.      STATEMENT OF FACTS

### A.      Westwood One's TM Studios Division

Westwood One provides radio stations with content including news media, sports, and radio shows.  (Statement of Undisputed Material Facts ("SUMF") 1).  In 2011, DIAL Global, including its TM Studios division, merged with Westwood One and began using Westwood One's name.  (SUMF 3).  Cumulus Media ("Cumulus") bought Westwood One in 2013.  (SUMF 3). Though TM Studios is not a currently existing entity (SUMF 6), it was owned by Cumulus until its intellectual property and assets were sold to Major Triad Media on October 30, 2020.  (SUMF 4).

At all times relevant to this dispute, the TM Studios division was based in Dallas, Texas. (SUMF 5).  Defendant Greg Clancy was employed by Westwood One as Vice President of Creative/General Manager. (SUMF 9).  Mr. Clancy was responsible for general and creative oversight of the business, reporting to Defendant Kirk Stirland. (SUMF 10).  Mr. Stirland served as Westwood One's President of Programming (SUMF 11), while Melissa Garza served as Westwood One's General Counsel.  (SUMF 12).  Throughout its existence, personnel numbers in the TM Studios division routinely contracted through numerous reductions in force necessitated by continued contractions in the radio industry at large.  (SUMF 7).

### B.      Affiliate Sales In The TM Studios Division

Radio stations generate revenue, in part, by selling advertising time. (SUMF 13). Radio stations also need musical jingles for both the station itself and for advertising clients, which affiliate sellers market and sell. (SUMF 14).  The TM Studios division was Westwood One's business line focusing on producing and selling jingles.  (SUMF 2).

While affiliate sales work can involve cash exchanges between affiliate sellers and radio stations, the majority of the exchange occurs through a barter system. (SUMF 15).  For example,

affiliate sellers offer to create jingles for radio stations in return for advertising time on that station's airwaves. (SUMF 16).  Once an affiliate seller has secured advertising time from a radio station, advertising sales personnel then sell the advertising time for cash. (SUMF 17). Westwood One's affiliate sellers were free to contact any radio station for sales opportunities, including those owned by other entities.  (SUMF 18).

Affiliate sellers rely on and cultivate relationships in the radio business to determine who controls sales of minutes of airtime at different stations, and then pitching jingles and sales to those individuals. (SUMF 19).  Affiliate sellers in the TM Studios division marketed both pre-made jingles from its existing collection of jingle packages, as well as custom jingles to radio stations and clients. (SUMF 20).  The TM Studios division primarily sold pre-made station jingles with approximately 95% of sales coming from its existing collection rather than entirely customized jingles. (SUMF 21).

Radio stations receive Average Quarter Hour ("AQH") ratings based on how many listeners typically tune in during any fifteen-minute block within a set window of time. (SUMF 22).  AQH ratings are converted into Weekly Gross Impressions ("WGIs" or "GIMPs") by multiplying the number of advertising segments sold by the station's AQH during that timeframe. (SUMF 23).  Sales made to larger stations produce higher GIMPs because larger stations have higher AQH ratings than smaller stations. (SUMF 24).

### C.    Cumulus' Employee Handbook

As a wholly owned, indirect subsidiary of Cumulus, Westwood One's employees received copies of Cumulus' employee handbook (the "Handbook") throughout Mr. Napier and Mr. Capozzoli's employment. (SUMF 25-26).   The Handbook contains an Equal Employment Opportunity policy prohibiting discrimination against employees on the basis of age as well as retaliation against employees who complain of discrimination, guaranteeing that allegations of

discrimination would be investigated. (SUMF 27).   Mr. Capozzoli received a copy of the Handbook every year, including the Equal Employment Opportunity policy. (SUMF 28).   Mr. Capozzoli acknowledged reading and understanding Westwood One's reporting policy procedures contained within the Handbook, indicating that he understood it was his responsibility to report any potential violations of the Equal Employment Opportunity policy to his business manager or corporate legal representatives. (SUMF 29).   Mr. Napier similarly acknowledged receiving the Handbook.  (SUMF 30).

### D.    Plaintiffs' Employment In Westwood One's TM Studios Division

Mr. Capozzoli lived and worked in New Jersey during his employment with Westwood One.  (SUMF 31).  Throughout his employment, Mr. Capozzoli undertook affiliate sales work in the TM Studios division. (SUMF 32).  Mr. Capozzoli never held a supervisory role at Westwood One. (SUMF 39). When Mr. Capozzoli started working in the TM Studios division in 2010, he was paid on a per-deal basis. (SUMF 33).  From 2010 until 2015, Mr. Capozzoli received a $55,000 annual salary as well as a commission based on his number of GIMPs, with average annual commissions between $40,000 and $55,000.  (SUMF 34).

Prior to 2015, only Mr. Capozzoli, Jim Weisz ("Mr. Weisz"), and Chris Stevens ("Mr. Stevens")[2] were conducting affiliate sales for the TM Studios division.  (SUMF 35).  In 2015, all Westwood One affiliate sellers—including those in the TM Studios division—experienced a change in compensation, which resulted in Mr. Capozzoli making roughly half the amount in commissions than he did from 2010 to 2015.  (SUMF 36).  Mr. Stevens left his employment due to this change in compensation, at which time Mr. Capozzoli handled all nationwide sales.  (SUMF 37, 47).  In 2017, all Westwood One affiliate sellers—including those in the TM Studios division—

---

[2] Mr. Stevens' legal name is William Mossay.

experienced another change in compensation, which resulted in Mr. Capozzoli earning more income in 2017 than he did in 2016. (SUMF 38).

Mr. Capozzoli was never placed on a performance improvement plan ("PIP") during his employment.  (SUMF 40).  Mr. Capozzoli "was loved" and Mr. Clancy informed him that he wanted another employee like Mr. Capozzoli.  (SUMF 41).  Mr. Napier and Mr. Capozzoli have known each other since the late 1990s. (SUMF 42).  Mr. Capozzoli referred Mr. Napier to an opening for a regional manager of affiliate sales with Westwood One (SUMF 43), and Mr. Napier became an affiliate seller in the TM Studios division in June of 2016.  (SUMF 44).  Mr. Capozzoli never protested Mr. Napier's move to the TM Studios division because "running the country was a lot of work" even though it would add competition relative to Mr. Capozzoli's commissions. (SUMF 47).

Mr. Napier lived in South Carolina during his employment with Westwood One without ever working in New Jersey.  (SUMF 46).  He reported to Mr. Clancy while working in the TM Studios division. (SUMF 48).  Dennis Green ("Mr. Green") oversaw all affiliate sales for all Westwood One products during this time. (SUMF 49).  Mr. Napier and Mr. Capozzoli split their nationwide target market evenly, so each was attempting to sell half of the market.  (SUMF 50). Mr. Napier's compensation structure never changed during his employment at Westwood One. (SUMF 51).

### E.    The TM Studios Division Launches A Critical New Product: TM EVO

In 2017, Mr. Stirland introduced an updating jingle service called EVO to the TM Studios division (SUMF 52), which launched in April of 2017.  (SUMF 53).  EVO allowed clients to customize their jingles by specifying a desired selection of music and vocal treatment. (SUMF 54). EVO thereby expanded the customizability of pre-packaged jingles offered by the TM Studios division by allowing clients to choose further variations upon expanded music treatments.  (SUMF

55).  EVO consisted of Westwood One's pre-packaged jingles, but with added monthly updates. (SUMF 56).

EVO was intended to replace several other products marketed through affiliate sellers in the TM Studios division.  (SUMF 57).  Mr. Napier saw no problems with the development of EVO, stating that "new products of any kind are always good."  (SUMF 58).  It was the goal of the affiliate sellers in the TM Studios division to aggressively market the new product.  (SUMF 59). As a result, Mr. Stirland asked Mr. Capozzoli and Mr. Napier to predict how many deals they could expect to make on EVO, and Mr. Capozzoli and Mr. Napier predicted four or five deals per month. (SUMF 60).  Mr. Napier informed Mr. Clancy that he and Mr. Capozzoli projected 5.5 EVO deals each per month, totaling 400,000 GIMPs.  (SUMF 62).  The projected 400,000 GIMPs per month in EVO deals did not constitute a compensation goal, and Mr. Napier and Mr. Capozzoli were not compensated differently if they achieved 400,000 GIMPs per month.  (SUMF 63).  In other words, if Plaintiffs had not accomplished their sales goals, they would have, nonetheless, received their full compensation under the commission plan in place.  (SUMF 64).  As a result, Mr. Capozzoli's compensation rose again from 2017 to 2018.  (SUMF 65).  These sales goals did not apply to affiliate sellers outside the TM Studios division because EVO marketed exclusively through the TM Studios division.  (SUMF 61).

According to Mr. Capozzoli, during a July 2016 conversation discussing the new EVO service, Mr. Stirland stated that "TM is old and stodgy and long in the tooth" and needed a "younger, more hip sales team."  (SUMF 66).  According to Mr. Napier, Mr. Stirland discussed the reputation of the TM Studios division with Mr. Capozzoli and Mr. Napier during this meeting, and "mentioned that TM was thought of as old and stodgy."  (SUMF 67).  Mr. Stirland further allegedly stated that "in addition to having a different product that would generate more interest,

that it was important to him that there was that hipness youth factor kind of built into the whole

persona."  (SUMF 68).  Mr. Stirland had never made a similar reference regarding Mr. Capozzoli

or the TM Studios division in the preceding seven years that Mr. Capozzoli had worked with Mr.

Stirland, and Mr. Capozzoli could not testify with certainty if Mr. Stirland was referring to TM

Studio's products.  (SUMF 69).  Mr. Stirland did not state that Mr. Napier was old and stodgy.

(SUMF 70).

     Approximately two weeks later during another conference call to discuss EVO, Mr.

Stirland stated that TM Studios would be replacing the "old" jingle updating services with the

"new" EVO service.  (SUMF 71).  Mr. Capozzoli alleges that Mr. Stirland made similar comments

six times, three of which were in 2016 and three of which were in 2017. (SUMF 72).  Mr. Napier

alleges that he heard Mr. Stirland reiterate these comments five or six times over the course of the

next several months.  (SUMF 73).  "It was just kind of the theme about, you know, the whole vibe

of the company."  (SUMF 73).  Each of these instances focused on perception of TM Studios in

connection with the release of EVO.  (SUMF 74).

     After August 2017, Mr. Capozzoli cannot recall Mr. Stirland specifically commenting

further on this topic. (SUMF 75).  The last time Mr. Napier heard Mr. Stirland make any such

comments was in 2017.  (SUMF 76).  Mr. Clancy never said anything regarding Mr. Capozzoli's

age. (SUMF 77).  Though Mr. Napier maintains that he considered these comments discriminatory

when they were made, he did not report the statements at any time.  (SUMF 78).  At the time these

statements were allegedly made, Mr. Napier was aware that human resources personnel and Ms.

Garza were available to receive reports of instances of workplace harassment or discrimination.

(SUMF 79).

### F.    Plaintiffs Fell Short Of Their Performance Goals

Mr. Capozzoli came close to achieving his EVO sales goals—though he failed to achieve

them—and received a "rock star bonus." (SUMF 80).  Mr. Capozzoli was never placed on a performance improvement plan, and no issues with his sales performance were brought to his attention in 2017 and 2018. (SUMF 81).

In September of 2017, Mr. Napier had zero GIMPs for EVO. (SUMF 82).  On October 9, 2017, Mr. Clancy emailed Mr. Napier stating that Mr. Napier had not met his goal of 400,000 GIMPs for September of 2017. (SUMF 83).  Mr. Clancy's email also informed Mr. Napier that he was "here to assist in any way possible to help [Mr. Napier] obtain that goal. Let me know whatever I can do to help." (SUMF 84).  On November 10, 2017, Mr. Clancy emailed Mr. Napier regarding his 84,000 GIMPs in new EVO deals, which was approximately 316,000 GIMPs short of his 400,000 GIMPs goal. (SUMF 85).  At that time, Mr. Napier had added three new affiliate sales, which was 2.5 short of his goal of 5.5. (SUMF 86).

Mr. Clancy's email again concluded stating that he was there to help Mr. Napier meet his goals in any way possible, requesting that Mr. Napier let him know what Mr. Clancy could do to help. (SUMF 89).  In response, Mr. Napier assured Mr. Clancy that he was going to do the best he could to improve his performance. (SUMF 90).  Mr. Napier further stated that he and Mr. Capozzoli would "talk frequently about different sales things to use in [their] pitch and all of that kind of things." (SUMF 91).  Mr. Napier offered no further insight into his plan to improve his performance, nor did he request any further resources from Mr. Clancy to assist. (SUMF 92).

Mr. Clancy discussed Mr. Napier's work performance on several occasions with Mr. Napier, Mr. Stirland, and Ms. Garza. (SUMF 96).  On December 7, 2017, Mr. Napier was placed on a Performance Improvement Plan ("PIP") regarding his poor performance. (SUMF 97).  Though Mr. Napier thought his performance was roughly equivalent to Mr. Capozzoli's performance in September and November of 2017, the PIP pointed out that Mr. Capozzoli had

booked over one million GIMPs in new EVO business.  (SUMF 98).  The PIP further reiterated Mr. Napier's performance goals and indicated that his performance would be reviewed again on January 8, 2018.  (SUMF 99).  Between December 11, 2017 and January 9, 2018, Mr. Napier had zero new EVO sales "probably because [he] was on vacation at the end of the year."  (SUMF 103).

In December of 2017, Mr. Clancy called Mr. Capozzoli to request that he participate in a conference call with Mr. Napier aimed at improving Mr. Napier's failing performance.  (SUMF 93).  Mr. Capozzoli declined to participate, informing Mr. Clancy that he "didn't want to be involved if [Mr. Capozzoli's] job was not in jeopardy."  (SUMF 94).  Mr. Capozzoli alleges that during this call, Mr. Clancy referred to Mr. Napier as an old musician looking for a gig.  (SUMF 95).

On January 5, 2018, Mr. Napier replied to the email informing him of his PIP, alleging for the first time during his employment with Westwood One that he had been discriminated against because of his age.  (SUMF 100).  Mr. Napier's email referenced issues with information contained in his PIP and concluded with the sentence: "As I'm unable to surmise why I'm being targeted other than I'm currently 64 years old, my only conclusion is that this is age discrimination." (SUMF 101).  The email made no reference to any comments made by Mr. Stirland regarding hiring younger salespeople in the TM Studios division. (SUMF 102).  On January 10, 2018, Ms. Garza responded to Mr. Napier's complaint of age discrimination, stating in part "Westwood wholly refutes your allegations of age discrimination. Your managers have the right to establish goals for the business, which they have done and communicated to you. We anticipate you'll work hard to meet them."  (SUMF 104).

Mr. Napier responded to Ms. Garza reiterating that he was being held to a higher standard because of his age, but again failed to mention any comments allegedly made by Mr. Stirland.

(SUMF 105). Mr. Napier's reply also compared his alleged treatment to Mr. Capozzoli's treatment, stating that TM Studios was holding Mr. Napier "alone to a much higher standard than any other affiliate representative at Westwood One, including my counterpart at TM Studios." (SUMF 106). According to Mr. Napier, he was motivated to submit his age discrimination claim because Mr. Capozzoli informed him that Mr. Clancy asked Mr. Capozzoli to call Ms. Garza, who provide instruction about what he should say to Mr. Napier regarding his performance. (SUMF 108, 109).

From November 1, 2017 through January 26, 2018, Mr. Capozzoli had a cash value of $78,525 new EVO sales, while Mr. Napier had $20,620 in new EVO sales. (SUMF 110). Mr. Napier doubts these numbers because "they put me through humiliation, aggravation, harassment for months, for the better part of a year. And then terminated me and replaced me with somebody 20 years younger about six weeks later." (SUMF 111). Mr. Napier also disputes that Mr. Capozzoli achieved over one million GIMPs in new EVO sales because Mr. Napier "think[s] it could be wrong." (SUMF 87). However, Mr. Napier has no documentation nor data to suggest that this information is inaccurate. (SUMF 88). Mr. Napier's sales numbers improved by April of 2018, and Westwood One ceased advising Mr. Napier that his performance was poor. (SUMF 112).

### G. Plaintiffs Were Terminated As Part Of The TM Studios Division's Planned Reduction In Force

Mr. Stirland, Mr. Clancy, and Westwood One Chief Operating Officer Charles Steinhauer instituted a planned reduction in force for the TM Studios division to coincide with Westwood One's decision to shut down its profitable HitDisc division at the end of 2018. (SUMF 114). Of the six individuals terminated from TM Studios between November and December of 2018, four were younger than Mr. Napier at ages 62, 55, 46, and 37. (SUMF 116). Specifically, affiliate seller

Mr. Weisz was 37 when he was terminated as part of the reduction in force in 2018.  (SUMF 118).
Among the individuals retained was a 62-year-old studio engineer.  (SUMF 117).

After the reduction in force, the duties of marketing and selling EVO were absorbed by
existing employees within the TM Studios division, as well as 45-year-old rehired Vice President
of Affiliate Management Mr. Stevens.  (SUMF 119).  Mr. Stevens was selected in part because of
his managerial skills and because Mr. Clancy needed the position to be based in Dallas where the
TM Studios division was based.  (SUMF 119).  Under the new business model, creative personnel
were involved in the sales process because "knowing the products like [creative personnel] do, and
being able to engage with customers, not as sellers, but as creatives, enhanced [the TM Studios
division's] ability to sell, because [clients] didn't feel like they were being sold to."  (SUMF 120).
Mr. Napier does not know what services Mr. Stevens was providing to the TM Studios division
when he returned in 2019.  (SUMF 121).  Mr. Capozzoli contends that Dave Bethell and Mr.
Stevens replaced him in the TM Studios division. (SUMF 122).

Mr. Napier received a severance agreement stating that his position was being eliminated
as part of a reduction in force.  (SUMF 124).  Mr. Napier concedes that if Mr. Stirland and Mr.
Clancy desired younger employees in the TM Studios division, they could have simply not hired
Mr. Napier in the first place.  (SUMF 125).  Mr. Napier maintains that neither Mr. Stirland nor
Mr. Clancy knew how old Mr. Napier was because they had never seen him prior to hiring him,
even though they had his résumé attesting to his work experience as far back as 1981.  (SUMF
126).  Mr. Napier also acknowledges that he filled out paperwork with human resources personnel
that listed his age prior to beginning his tenure with the TM Studios division.  (SUMF 127).

Mr. Capozzoli alleged that his evidence that he was terminated due to his age was because
he and Mr. Napier were terminated effective November 15, 2018, while other employees impacted

by Westwood One's reduction in force were not terminated until the end of 2018. (SUMF 128). Specifically, Mr. Capozzoli contends that he was not terminated as part of a reduction in force because his last day was approximately one month prior to Mr. Weisz's last day, and Mr. Capozzoli does not "understand how you have a reduction in force and different termination dates." (SUMF 129). Mr. Napier has "no idea" why some employees were terminated pursuant to the reduction in force in November of 2018 while others were terminated in December of 2018. (SUMF 130). These employees were retained until December 31, 2018 in order to allow for continued communication with customers as the HitDisc division was shut down. (SUMF 114, 115).

Mr. Capozzoli testified that Westwood One discriminated against Mr. Napier on the basis of his age because Mr. Clancy called him an old musician looking for a gig, and because sales goals for EVO were unfair. (SUMF 136). Mr. Capozzoli further testified that he was terminated for declining to participate in a phone call with Mr. Napier regarding improving Mr. Napier's performance because Mr. Clancy "kind of went quiet" thereafter. (SUMF 131). Mr. Capozzoli believes his decision not to participate in this call is the sole reason he was retaliated against. (SUMF 132). Mr. Capozzoli acknowledges that he did not receive negative feedback regarding his performance, that Mr. Clancy remained in contact with him prior to his termination, and that "everything was good." (SUMF 133). Mr. Stirland's behavior towards Mr. Capozzoli did not change after Mr. Capozzoli declined Mr. Clancy's request to participate in a phone call with Mr. Napier regarding performance. (SUMF 134).

Mr. Napier contends that he was not fired in December of 2017 following several emails regarding his poor performance because "they needed to leave an appropriate paper trail, and one of the ways you do that in corporate America is to have various performance reviews and memos." (SUMF 135). Mr. Capozzoli further testified that Westwood One discriminated against him on

the basis of his age because Mr. Stirland allegedly made derogatory comments in which the words "old" and "stodgy" were used during conversations in 2016 and 2017 discussing EVO. (SUMF 137).

Mr. Capozzoli alleges that he informed Mr. Green and contract manager Debbie Westover that he "thought they were messing with Lee [Napier] because of his age" in September of 2017, over one year before his termination. (SUMF 140).   However, Mr. Capozzoli never reported allegations of age discrimination to human resources (SUMF 139), nor did he put these allegations in writing. (SUMF 141).   Mr. Napier does not dispute that because of the reduction in force, TM Studios was able to reduce its total salaries paid by $251,829.  (SUMF 142).   Similarly, Mr. Capozzoli acknowledges that salary expenditures decreased within the TM Studios division following the reduction in force, from $1,004,865 to $753,036.  (SUMF 143).

## III.    STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To show that no issue of material fact exists, Westwood must prove "that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial."  *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007).  A disputed fact is material "only if it will affect the outcome of the lawsuit under the applicable law[.]"  *Doe v. Bd. of Educ. of Vocational-Tech. Sch. Dist. in Cty. of Gloucester*, No. CV 17-13793 (RBK/JS), 2019 WL 2183860, at *2 (D.N.J. May 21, 2019).  A dispute over a non-material or irrelevant fact "will not preclude a grant of summary judgment."  *Ianuale v. Borough of Keyport*, No. CV 16-9147FLWLHG, 2018 WL 5005005, at *3 (D.N.J. Oct. 16, 2018).

Once the party seeking summary judgment establishes that there is no genuine dispute as to any material fact regarding the claim and that it is entitled to judgment as a matter of law, the

opposing party may not defeat the motion by "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Baseless denials of material facts or mere reiterations of legal conclusions will not create material fact issues. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1110 (3d Cir. 1985), *cert. denied*, 475 U.S. 1013 (1986); *Chaffee v. Kraft Gen. Foods, Inc.*, 886 F. Supp. 1164, 1167 (D.N.J. 1995).

A disputed fact is "material" only if its resolution might affect the outcome of the case. *Stasicky v. S. Woods State Prison*, No. 03-369 (FLW), 2006 WL 1723467, at *5 (D.N.J. June 7, 2006). Disputes regarding irrelevant or unnecessary facts do not preclude a grant of summary judgment. *Id.* To survive summary judgment, the non-moving party must set forth more than "a mere scintilla of evidence" in his favor. *Chapman v. Am. Inst. of Certified Pub. Accts.*, No. Civ. A. 03-3692 (WHW), 2005 WL 2620191, at *2 (D.N.J. Oct. 13, 2005), *aff'd*, 233 F. App'x 141 (3d Cir. 2007) (citing *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005)).

## IV.    LEGAL ARGUMENT

### A.    Westwood Is Entitled To Summary Judgment As To Counts I And III Of The Complaint Because Plaintiffs Cannot Establish That Any Of The Defendants Discriminated Against Them Because Of Their Age

The NJLAD makes it unlawful for an employer to terminate employees because of their age. *See* N.J. Stat. Ann. § 10:5-12(a). To prevail on such a claim, Plaintiffs must show that age "'played a role in the decision making process and that it had a determinative influence on the outcome of that process.'" *Jackson v. Am. Water Works Co.*, Civ. No. 10-3885 (RMB/JS) U.S. Dist. LEXIS 73805, at *27 (D.N.J. May 25, 2012) (*citing Bergen Com. Bank v. Sisler*, 157 N.J. 188 (N.J. 1999)). Similarly, the ADEA provides a federal remedy against age discrimination in employment for people who are at least forty years of age. *See* 29 U.S.C. §§ 623, 631(a). Specifically, the ADEA prohibits an employer from discharging or otherwise discriminating

"against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To succeed on a discrimination claim under the ADEA, Plaintiffs must prove that their membership in a protected class actually motivated or had a determinative influence on an adverse employment decision. *See Fasold v. Just.*, 409 F.3d 178, 183-84 (3d Cir. 2005).

Age discrimination claims under the ADEA and the NJLAD are analyzed co-extensively and subject to the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 241 (3d Cir. 2007); *McClement v. Port Auth. Trans-Hudson Corp.*, No. CIV. A. 09-522 SRC, 2011 WL 2600738, at *4 (D.N.J. June 29, 2011), *aff'd sub nom., McClement v. Port Auth. Trans-Hudson*, 505 F. App'x 158 (3d Cir. 2012). [3] Under this three-part framework, the plaintiff must first establish a *prima facie* case of discrimination. To establish a *prima facie* case, Plaintiffs must prove that: (1) they are members of a protected class; (2) they were performing their jobs at a level that met their employer's legitimate expectations; (3) they were subjected to an adverse employment action; and (4) the adverse actions occurred under circumstances that could give rise to an inference of intentional discrimination. *See Zive v. Stanley Roberts Inc.*, 182 N.J. 436, 447-48 (2005); *Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 14 (2002); *see also Victor v. State*, 203 N.J. 383, 409-10 (2010). The fourth element has been consistently interpreted to require that Plaintiffs show they were replaced by a substantially younger individual

---

[3] Throughout this memorandum of law, Westwood incorporates Plaintiffs' Age Discrimination in Employment Act of 1967 ("ADEA") claims throughout its arguments regarding Plaintiffs' NJLAD age discrimination claims. *See Abrams v. Lightolier, Inc.*, 841 F. Supp. 584, 596 (D.N.J. 1994) *aff'd*, 50 F.3d 1204 (3d Cir. 1995) (citing *Giammario v. Trenton Bd. of Educ.*, 203 N.J. Super. 356 (App. Div. 1985), *cert. denied*, 12 N.J. 102 336 (1986)) ("Age discrimination claims under the NJLAD are appropriately analyzed by examination of federal cases arising under Title VII and the ADEA.").

sufficient to support an inference of discriminatory animus. *See Jackson v. Trump Ent. Resorts, Inc.*, 149 F. Supp. 3d 502, 512 (D.N.J. 2015) (*citing Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004)); *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001) (holding that the fourth element depends on whether plaintiff's "replacement was sufficiently younger to permit a reasonable inference of age discrimination."); *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234 (3d Cir. 1999) (holding that the fourth element is "the plaintiff was replaced by a sufficiently younger person to create an inference of age discrimination") (*quoting Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)). The "central focus" of the *prima facie* case "is always whether the employer is treating 'some people less favorably than others because of their [protected status].'" *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (recognizing that plaintiff must prove that age was the "but-for" cause of employer's adverse employment decision).

If Plaintiffs establish a *prima facie* case, the burden shifts to Westwood to articulate a legitimate, non-discriminatory reason for their treatment of Plaintiffs. *Clowes v. Terminex Int'l Inc.*, 109 N.J. 575, 595-96 (1988). If Westwood meets this burden, Plaintiffs ultimately must prove that Westwood's proffered reason was a pretext for discrimination. *Id.* Throughout the burden-shifting paradigm, the ultimate burden of proving intentional discrimination remains with Plaintiffs. *Id.* at 596 (citing *Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 493 (1982)).

### 1. Plaintiffs Were Not Terminated Under Circumstances Giving Rise To An Inference of Discrimination

Plaintiffs' speculation and personal feelings regarding the end of their employment cannot create an inference of discrimination and are insufficient to preclude summary judgment in Westwood's favor. *Chambers v. Hidelberg USA, Inc.*, No. 04–583 (RBK), 2006 U.S. Dist. LEXIS 32334, at *14 (D.N.J. May 5, 2006). Rather, Plaintiffs must deduce "hard" and "concrete"

evidence.  *El v. Se, Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 237 n.6 (3d Cir. 2007);

*Heffron v. Adamar of New Jersey, Inc.,* 270 F. Supp. 2d 562, 575 (D.N.J. 2003).

### a.    Plaintiffs were terminated as part of a RIF.

There are no indicia that the decision to terminate Plaintiffs' employment was based on

their ages.  Plaintiffs were terminated as part of a reduction in force in late 2018 in which all three

of the affiliate sellers were impacted.   In an age discrimination case where the plaintiff is

terminated as a result of a reduction in force, the plaintiff must show "that the employer retained

a sufficiently younger similarly situated employee."  *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d

296, 301 (3d Cir. 2004); *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 250 (3d Cir. 2002).  An

employee is "similarly situated" when the evidence supports a claim that the plaintiff and a retained

employee shared comparable duties. *Id.*  "This determination requires a court to undertake a fact-

intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner."

*Monaco*, 359 F.3d at 305;  *see also Lepore v. Lanvision Sys., Inc.*, 113 F. App'x. 449, 452 (3d Cir.

2004) (opining that similarly situated employees "work in the same area in approximately the same

position") *(citing Anderson,* 297 F.3d at 249-50).

As shown in the undisputed facts, all affiliate sellers in the TM Studios division—including

37-year-old Mr. Weisz—were terminated pursuant to the same reduction in force regardless of

age.  (SUMF 116, 118).  Further, four of the six individuals terminated from TM Studios as part

of the reduction in force between November and December of 2018 were younger than Mr. Napier.

(SUMF 116).  Therefore, similarly situated employees were not retained by Westwood's reduction

in force, and Plaintiffs cannot show that they would not have been subjected to the alleged adverse

action in question "but for" their protected classification.  *See Monaco*, 359 F.3d at 301; *see also*

*Gross*, 557 U.S. at 177 (2009).  Based on the age of the individuals impacted by the reduction in

force alone, the record is clear that age did not play a role, let alone could it be considered the determinative factor for the selection of the Plaintiffs to be impacted by the reduction in force.

>    **b.**      **Plaintiffs' purported circumstantial evidence fails to prove a discriminatory motive.**

Setting aside Plaintiffs' inability overcome the legitimacy of the reduction in force that resulted in their terminations, their other alleged evidence of ageism fails, as well.

>    **(1)**      **Stray remarks unconnected in time and context to Plaintiffs' terminations fail to show discriminatory motive.**

When pressed for facts to support their allegations, Mr. Capozzoli testified that Westwood One discriminated because Mr. Stirland allegedly made derogatory comments in which the words "old" and "stodgy" were used during conversations in 2016 and 2017 discussing EVO. (SUMF 137). In July of 2016, Mr. Stirland discussed the reputation of the TM Studios division with Mr. Capozzoli and Mr. Napier, and "mentioned that TM was thought of as old and stodgy" and needed a "more hip sales team." (SUMF 66-67). Approximately two weeks later during another conference call to discuss EVO, Mr. Stirland stated that TM Studios would be replacing the "old" jingle updating services with the "new" EVO service. (SUMF 71). Mr. Capozzoli alleges that Mr. Stirland made similar comments six times, three of which were in 2016 and three of which were in 2017. (SUMF 72). After August 2017, Mr. Capozzoli cannot recall Mr. Stirland specifically commenting further on this topic utilizing the terms "old" or "stodgy." (SUMF 75). Mr. Clancy never said anything regarding Mr. Capozzoli's age (SUMF 77) though Mr. Capozzoli alleges that Mr. Clancy once referred to Mr. Napier as an "old musician looking for a gig." (SUMF 95).

According to Mr. Napier, Mr. Stirland stated about TM Studios that "in addition to having a different product that would generate more interest, that it was important to him that there was

that hipness youth factor kind of built into the whole persona." (SUMF 68).  Mr. Napier also alleges that he heard Mr. Stirland reiterate the comments referenced by Mr. Capozzoli five or six times over the course of the next several months, stating that "[i]t was just kind of the theme about, you know, the whole vibe of the company." (SUMF 73).  Each of these instances focused on the perception of TM Studios in connection with the release of EVO. (SUMF 74).  The last time Mr. Napier heard Mr. Stirland make any such comments was in 2017. (SUMF 76).

Mr. Stirland's comments about the reputation of the TM Studios product is not evidence that he harbored a discriminatory animus toward Mr. Capozzoli or Mr. Napier.  Indeed, Mr. Stirland had never made a similar reference regarding Mr. Capozzoli or the TM Studios division in the preceding seven years that Mr. Capozzoli had worked with Mr. Stirland.  (SUMF 69).  Mr. Capozzoli testified that he cannot say with certainty if Mr. Stirland was referring to him or the TM Studio's products. (SUMF 69). Plaintiffs confirmed that Mr. Stirland did not state that Mr. Napier was old and stodgy. (SUMF 70).  Additionally, neither Plaintiff alleges that they heard these allegedly ageist comments within, at a minimum, eleven months of their terminations.  These alleged stray remarks unconnected in time and context to Plaintiffs' terminations cannot be construed as discriminatory.  *See Bleistine v. Diocese of Trenton*, 914 F. Supp. 2d 628, 633 (D.N.J. 2012) (citing *Hyland v. Am. Int'l Grp.,* 360 F. App'x 365, 367 (3d Cir. 2010)) (granting summary judgment in Defendant's favor in a case alleging age discrimination under the ADEA and NJLAD because the decisionmaker's comments that Plaintiff was an "old" thinker made seventy days before the termination could not support an inference of age discrimination).

### (2) Westwood was aware of Mr. Napier's age when he was hired.

Again, realizing that the evidence does not support their assertion of ageism, Mr. Napier turns to the argument that neither Mr. Stirland nor Mr. Clancy knew how old Mr. Napier was

before hiring him because they had never seen him before.  (SUMF 126.)  This assertion fails to

support any suggestion of age discrimination as he conceded they had his resume attesting to his

work experience as far back as 1981. (SUMF 126).  Indeed, Mr. Napier also conceded that if Mr.

Stirland and Mr. Clancy desired younger employees in the TM Studios division, they could have

simply not hired Mr. Napier in the first place. (SUMF 125).  Mr. Napier also acknowledged that

he filled out paperwork with human resources personnel that listed his age prior to beginning his

tenure with the TM Studios division. (SUMF 127).  All of this is to say, had Mr. Stirland and Mr.

Clancy had a preference toward younger affiliate sellers, they simply could have not hired him or

terminated him during the months-long process during which he was on a PIP.

### (3)   Plaintiffs cannot show that they were compensated differently due to their ages.

As an additional attempt to demonstrate agism, Plaintiffs pleaded that their compensation

structure was changed, unlike other affiliate sales employees.  This assertion also did not withstand

the test of discovery as both Plaintiffs testified that their compensation structure was handled

*exactly the same* as all of the other affiliate sellers. (SUMF 36-38).  In 2015, *all* Westwood One

affiliate sellers—including those in the TM Studios division—experienced a change in

compensation. (SUMF 36).  In 2017, *all* Westwood One affiliate sellers—including those in the

TM Studios division—experienced another change in compensation. (SUMF 38).  This change in

compensation applied to all Westwood One affiliate sellers—including approximately 36-year-old

Mr. Weisz—who were paid the same under the plan. (SUMF 37-38, 116).  Further, Plaintiffs'

failure to meet their EVO goals did not alter their compensation under the existing commissions

plan.  (SUMF 64).  The projected 400,000 GIMPs per month in EVO deals did not constitute a

compensation goal, and Mr. Napier and Mr. Capozzoli were not compensated differently if they

achieved 400,000 GIMPs per month. (SUMF 63).  To the contrary, Mr. Capozzoli's compensation

actually rose from 2017 to 2018. (SUMF 65).  Mr. Napier's compensation structure never changed during his employment at Westwood One. (SUMF 51).  The fact that they did not experience any negative compensation change and were compensated *exactly the same* as the other affiliate sellers fails to offer any support to their claims of age discrimination their claims of age discrimination. *See Farmer v. Camden City Bd. of Educ.*, Civ. No. 03-685 (JBS) 2005 U.S. Dist. LEXIS 7339, at *45 (Mar 28, 2005) (finding that plaintiff did not raise an inference of discrimination where plaintiff's compensation, benefits, and other terms of employment remained the same).

### 2.    Mr. Napier Is Not Entitled To Relief Under The NJLAD Because He Is A Resident of South Carolina

Westwood is a Delaware corporation with its corporate headquarters located in New York. (Complaint ¶12). At all relevant times, Mr. Napier resided in and continues to reside in South Carolina. (Complaint ¶7).  Mr. Napier also never performed any work in New Jersey.  (SUMF 46). Mr. Napier's NJLAD claims must be dismissed because the NJLAD does not apply to out-of-state plaintiffs. *Seibert v. Quest Diagnostics, Inc.*, No. Civ. 11-304 KSH, 2012 WL 1044308, at *4-5 (D.N.J., March 28, 2012) (NJLAD did not apply to out-of-state plaintiffs even though defendant had corporate headquarters and made decisions in New Jersey); *Norenius v. Multaler, Inc.*, No. A-4481-06T2, 2008 WL 4162878, at *1-2, 6-7 (N.J. Super. Ct. App. Div., Sept. 11, 2008) (NJLAD did not apply even though defendant was headquartered in New Jersey, plaintiffs took business trips to New Jersey, and some wrongful conduct emanated from New Jersey, as plaintiffs worked in California and Colorado); *Mahanandigari v. Tata Consulting Servs.*, No. 2:16-cv-08746-JLLSCM, 2017 WL 6892918, at *3 (D.N.J., Nov. 9, 2017), *report and recommendation adopted sub nom. Mahanandigari v. Tata Consultancy Servs.*, No. CV 16-8746 (JLL) 2018 WL 396235 (D.N.J., Jan. 11, 2018).

**B.     Westwood Is Entitled To Summary Judgment As To Counts II And IV Of The Complaint Because Plaintiffs Cannot Establish That Any Of The Defendants Retaliated Against Them**

To establish a claim of retaliation, Plaintiffs must show that: (1) they were engaged in protected activities; (2) Westwood took an adverse employment action after or contemporaneous with Plaintiffs' protected activity; and (3) a causal link exists between the protected activity and the adverse action. *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 508-509 (3d Cir. 2004) (*citing Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000)).  Retaliation claims under the ADEA and NJLAD are analyzed under the *McDonnell Douglas* burden-shifting analysis, set forth in Section IV.A. *supra*. *Deville v. Givaudan Fragrances Corp.*, 419 F. App'x 201, 205 (3d Cir. 2011) (citations omitted).

**1.     Mr. Capozzoli Did Not Engage In Protected Activity**

"The Third Circuit has described engaging in a protected activity as 'opposing any practice made unlawful' by the ADEA." *Ayres v. MAFCO Worldwide LLC*, Civ. No.  2020 U.S. Dist. LEXIS 130131, at *16 (July 23, 2020) (*quoting Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).  Similarly, protected activity under the NJLAD constitutes opposing "any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD.]" *Sgro v. Bloomberg L.P.*, 331 F. App'x. 932, 937 (3d Cir. 2009) (*citing* N.J. Stat. Ann. § 10:5-12(d).

In December of 2017, approximately one year before his termination, Mr. Capozzoli received a call from Mr. Clancy requesting that he participate in a conference call with Mr. Napier aimed at improving Mr. Napier's failing performance. (SUMF 93).  Mr. Capozzoli declined to participate. (SUMF 94).  Nonetheless, Mr. Capozzoli believes he was terminated in retaliation for declining to participate in this call because Mr. Clancy "kind of went quiet" thereafter. (SUMF

131).  Mr. Capozzoli testified that this was the sole reason he believes he was retaliated against. (SUMF 132).

Mr. Capozzoli fails to provide any basis for precisely how declining to participate in an optional phone call approximately one year before his termination constitutes a protected activity. Moreover, Mr. Capozzoli acknowledges that he did not receive negative feedback regarding his performance, that Mr. Clancy remained in contact with him prior to his termination, and that "everything was good." (SUMF 133).  Similarly, Mr. Stirland's behavior did not change towards Mr. Capozzoli after he declined to participate in the phone call.  (SUMF 134).

Mr. Capozzoli offers no evidence that he engaged in protected activity and testified that he never made any allegations regarding age discrimination pursuant to Westwood One's reporting policy.  (SUMF 139).  Instead, Mr. Capozzoli asserts that he informed Mr. Green and Ms. Westover that he "thought they were messing with Lee [Napier] because of his age" in September of 2017. (SUMF 140).  Neither Mr. Green nor Ms. Westover are alleged to have participated in the decision to terminate Plaintiffs, nor is it alleged that Mr. Clancy or Mr. Stirland were aware that Mr. Capozzoli allegedly mentioned this topic to anyone.  (*See generally* Complaint).  As his own assertions are insufficient to support a claim for retaliation, Mr. Capozzoli cannot prove that he engaged in a protected activity such that he can be entitled to relief under a theory of retaliation. *See Dooley v. Roche Labs, Inc.*, Civ. No. 04-2276 (GEB) 2007 U.S. Dist. LEXIS 10467, at *28-*29 (Feb. 15, 2007) (holding that where the decision-maker was unaware of the plaintiff's internal complaint at the time of the alleged adverse employment action, it is implausible that the action constituted retaliation).

2.     **No Causal Link Exists Between Plaintiffs' Alleged Protected Activities And Plaintiffs' Terminations**

To support his claim of retaliation, Mr. Napier asserts that he was terminated for complaining about age discrimination following the issuance of a PIP in December of 2017.  Mr. Capozzoli asserts that he was retaliated against for his refusal to speak with Mr. Napier around the same time.  Neither the timing between the alleged protected activity and Plaintiffs' terminations nor the facts surrounding their alleged protected activity support this theory. "A causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive." *Maddox v. City of Newark*, 50 F. Supp. 3d 606, 623 (D.N.J. 2014) (citing *Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J. Super. 543, 550 (App. Div. 1995)).  "[T]he mere fact that [an] adverse employment action occurs after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two.'" *Young v. Hobart W. Grp.*, 385 N.J. Super. 385, 467 (App. Div. 2005) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997).  To determine whether a causal connection exists between a plaintiff's protected activity and the adverse employment action, courts should consider all of the circumstances, including temporal proximity, evidence of ongoing antagonism, and the employer's stated reason for the adverse employment action.  *See Maimone v. City of Atl. City*, 188 N.J. 221, 237 (2006) (emphasis added) (citing *Est. of Roach v. TRW, Inc.*, 164 N.J. 598, 612 (2000)); *Hancock v. Borough of Oaklyn*, 347 N.J. Super. 350, 361 (App. Div. 2002).  Plaintiffs cannot point to evidence of these factors to prove their retaliation claims.

Turning first to temporal proximity, "[t]he amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation."  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).  "Where the temporal proximity is not 'unusually suggestive,' [the Court]

ask[s] whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'"

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n.*, 503 F.3d 217, 232 (3d Cir. 2007) (*quoting Farrell*,

206 F.3d at 280). Here, Plaintiffs cannot overcome the lack of temporal proximity between their

alleged protected activities and their terminations. Mr. Capozzoli declined to participate in a phone

call with Mr. Napier regarding the latter's poor performance in December of 2017. (SUMF 94).

Mr. Napier complained of alleged age discrimination in an email on January 5, 2018. (SUMF

100). However, Plaintiffs were not terminated until November 15, 2018 as part of a reduction in

force, which also applied to employees younger than Plaintiffs. (SUMF 116, 128). Therefore, the

evidence shows that Plaintiffs lack temporal proximity between their terminations and their alleged

protected activity, which occurred almost eleven months earlier. *See Farrell*, 206 F.3d at 280

(holding that a period of nineteen months was too attenuated to create a genuine issue of fact as to

whether temporal proximity established the necessary element of causal connection).

Plaintiffs also fail to demonstrate that a pattern of antagonism existed against them or

members of their protected age category. First, Mr. Napier alleges that Westwood targeted him

based on his age by issuing him a PIP for poor performance. (SUMF 101). Not so. Prior to Mr.

Napier ever complaining of age discrimination, the record is replete with evidence that he was

failing to meet the sales expectations for TM EVO, even though he and Mr. Capozzoli were the

ones who created the sales goal. (SUMF 62). Following that, Mr. Napier failed to even come

close to the performance expectations he helped set. For example, Mr. Napier failed to meet his

goal of 400,000 GIMPs for September of 2017. (SUMF 83). By November of 2017, Mr. Napier

accumulated 84,000 GIMPs in new EVO deals, which was approximately 316,000 GIMPs short

of his 400,000 GIMPs goal. (SUMF 85). At that time, Mr. Napier had added three new affiliate

sales, which was 2.5 short of his goal of 5.5. (SUMF 86). On December 7, 2017, Mr. Napier was

placed on a PIP regarding his poor performance. (SUMF 97). The PIP further reiterated Mr. Napier's performance goals and indicated that his performance would be reviewed again on January 8, 2018. (SUMF 99). Nonetheless, between December 11, 2017 and January 9, 2018, Mr. Napier had zero new EVO sales "probably because [he] was on vacation at the end of the year." (SUMF 103).

The record evidence undercuts Mr. Napier's assertion that the performance management is evidence of retaliation. Mr. Napier acknowledges that as his sales numbers improved by June of 2018, Westwood no longer advised him regarding his poor performance. (SUMF 112). Therefore, the evidence demonstrates no causal connection between Mr. Napier's complaint and his termination. *See Horvath v. Rimtec Corp.*, 102 F. Supp. 2d 219, 235 (D.N.J. 2000) (holding that the plaintiff had failed to establish a causal link between his complaint and his employer's contemporaneous failure to award him a raise because the plaintiff received the raise at a later date when his employer's viewpoints regarding his performance changed). Like the plaintiff in *Horvath*, Mr. Napier has failed to demonstrate a causal link between his complaint of alleged age discrimination in January of 2018, and his eventual termination over eleven months later during the company's reduction in force.

For Mr. Capozzoli, even assuming he did engage in protected activity, he cannot point to *any* evidence of antagonism following his alleged refusal to participate in the conversation with Mr. Napier and his passing remarks to Mr. Green and Ms. Westover. His bare assertion that Mr. Clancy became quiet is insufficient to demonstrate retaliatory animus. *See Roa v. Roa*, 200 N.J. 555, 575 (2010) (holding "simple lack of good manners" do not constitute retaliatory acts under the NJLAD); *Hancock*, 347 N.J. Super. at 360 (holding that allegations of retaliatory conduct that made plaintiff's job "mildly unpleasant" and did not result in a substantial impact on plaintiff's

working conditions were insufficient to constitute unlawful retaliation); *Sporn v. Ocean Colony Condo. Ass'n*, 173 F. Supp. 2d 244, 253–54 (D.N.J. 2001) (noting that "the Court would simply be stretching the definition of 'interference' too far" if lack of friendliness, lack of civility, or mere shunning could constitute retaliation).

Plaintiffs have failed to demonstrate any evidence of antagonism following their alleged protected activity.  Paired with the lack of temporal proximity, Plaintiffs have not satisfied their burden of demonstrating a *prima facie* case of retaliation.

### C.    Plaintiffs Were Terminated As Part Of A Legitimate, Non-Discriminatory Business Reorganization Devoid Of Pretext

Assuming *arguendo* that Plaintiffs' can satisfy a *prima facie* case for age discrimination or retaliation (which they cannot), Westwood must then "articulate a legitimate, non-discriminatory reason" for the adverse action.  *See Zive*, 182 N.J. at 449; *Viscik*, 173 N.J. at 14.  If the employer satisfies its burden of production, the burden shifts back to the plaintiff to prove that the employer's proffered reason was "merely a pretext for discrimination and not the true reason for the employment decision."  *Zive*, 182 N.J. at 449; *see also, Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  To prove pretext, "the plaintiff must show that the employer's reason was both false and 'motivated by discriminatory intent.'  The burden of proof 'remains with the employee at all times,' and if the plaintiff cannot meet his obligation …, the employer will prevail on summary judgment."  *See Henry v. New Jersey Dep't of Hum. Servs.*, 204 N.J. 320, 331-32 (2010) (quoting *Zive*, 182 N.J. at 449-50, 456); *see also Zive*, 182 N.J. at 449 (burden of proving pretext "merges with the plaintiff's ultimate burden" of proving that "he was subjected to intentional discrimination"); *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1997).

Here, Westwood articulated a legitimate non-discriminatory reason for terminating Plaintiffs' employment—their positions were eliminated as part of TM Studio's reorganization.

The TM Studios division was Westwood One's business line that focused on producing and selling jingles. (SUMF 2).   Personnel numbers in the TM Studios division decreased over the years due to numerous reductions in force actions, which were caused by continued contractions in the radio industry.   (SUMF 7).   Mr. Stirland, Mr. Clancy, and Mr. Steinhauer instituted a planned reduction in force for the TM Studios division to coincide with Westwood One's decision to shut down its HitDisc division at the end of 2018.   (SUMF 114).   Six employees of the TM Studios division including Plaintiffs were terminated as a result.   (SUMF 116).   Four of the six individuals terminated from TM Studios as part of the reduction in force between November and December of 2018 were younger than Mr. Napier, and a 62-year-old employee was retained.   (SUMF 116, 117).   Further, Mr. Weisz was 37 when he was terminated as part of the reduction in force, demonstrating that all affiliate sellers in the TM Studios division were terminated pursuant to the business reorganization regardless of their ages. (SUMF 116, 118).

After the reduction in force, the duties of marketing and selling EVO were absorbed by existing employees within the TM Studios division, as well as 45-year-old rehired Vice President of Affiliate Management Mr. Stevens who was based in Dallas where the TM Studios division was headquartered.   (SUMF 119). In addition to his work in affiliate sales and Dallas location, Mr. Stevens provided crucial managerial skills which Plaintiffs lacked. (SUMF 39, 119).   The new business model involved creative personnel in the sales process because "knowing the products like [creative personnel] do, and being able to engage with customers, not as sellers, but as creatives, enhanced [the TM Studios division's] ability to sell, because [clients] didn't feel like they were being sold to."   (SUMF 120). Salary expenditures decreased within the TM Studios division following the reduction in force, from $1,004,865 to $753,036. (SUMF 143).   Westwood

has, therefore, established that Plaintiffs were terminated as part of the legitimate business decision to reorganize the TM Studios division.

In seeking to discredit the Westwood's proffered reason, it is not enough for Plaintiffs' to show that their employer's decision was merely "wrong or mistaken" or even "unfair" because "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765; *see also Viscik*, 173 N.J. at 14 (citing *Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 561 (1990)). Neither the judiciary nor a jury is permitted to second-guess an employer's "business judgment," *Jason v. Showboat Hotel & Casino*, 329 N.J. Super. 295, 307-08 (App. Div. 2000), or "to make personnel decisions for employers." *Peper v. Princeton Univ. Bd. of Trustees*, 77 N.J. 55, 87 (1978).

The record simply does not contain evidence to demonstrate that the TM Studios division's reorganization was pretext intended to hide a discriminatory motive for their terminations. Mr. Capozzoli baselessly contends that the reduction in force was pretextual because he and Mr. Napier were terminated effective November 15, 2018, while other employees impacted by Westwood One's reduction in force were not terminated until the end of 2018. (SUMF 128). Mr. Napier has "no idea" why some employees were terminated pursuant to the reduction in force in November of 2018 while others were terminated in December of 2018. (SUMF 130). In reality, several employees were retained until December 31, 2018 in order to allow for continued communication with customers as the HitDisc division was shut down. (SUMF 114, 115). The evidence demonstrates that Plaintiffs were terminated due to a legitimate business decision, and Plaintiffs cannot demonstrate otherwise. Therefore, Westwood is entitled to summary judgment as a matter of law.

## V.    CONCLUSION

Plaintiffs cannot prove the allegations of ageism and retaliation as alleged in their

Complaint.  Rather, the undisputed evidence establishes that Plaintiffs' claims against Defendants fail as a matter of law.  Put simply, Mr. Napier and Mr. Capozzoli were terminated because of a legitimate business decision to reduce the number of employees in the TM Studios division. Because no reasonable juror could find in Plaintiffs' favor, Defendants are entitled to summary judgment.  Accordingly, Defendants respectfully request that this Court grant their Motion for Summary Judgment and dismiss Plaintiffs' Complaint, with prejudice, in its entirety.

Respectfully submitted,

/s/ *Paul C. Lantis*
_____
Paul C. Lantis (NJ # 017902010)
plantis@littler.com
Aaron J. Creuz (NJ # 211692016)
acreuz@littler.com
**LITTLER MENDELSON, P.C.**
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102.1321
267-402-3000 | 267-402-3131 (fax)

*Attorney for Defendants, Westwood One, LLC,*
Dated:  August 19, 2021                          *William G. Clancy, and Kirk Stirland*