## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| MICHAEL J. CAPOZZOLI and LEE NAPIER, <br><br>        Plaintiffs, <br><br>    v. <br><br> CUMULUS MEDIA HOLDINGS, INC., *et al.*, <br><br>        Defendants. | Civil No. 20-4992 (RMB/AMD) <br><br><br> **OPINION** |

**APPEARANCES**

David Mikel Koller
Koller Law PC
2043 Locust Street, Suite 1B
Philadelphia, Pennsylvania 19103

     *On behalf of Plaintiffs*

Stephanie Jan Mensing
Mensing Law LLC
1635 Market Street, Suite 1600
Philadelphia, Pennsylvania 19103

     *On behalf of Plaintiff Michael J. Capozzoli*

Paul Calvin Lantis
Littler Mendelson, P.C.
Three Parkway, Suite 1400
1601 Cherry Street
Philadelphia, Pennsylvania 19102

     *On behalf of all Defendants*

**RENÉE MARIE BUMB, United States District Judge**

This matter comes before the Court upon the Motion for Summary Judgment brought by Defendants Westwood One, LLC ("Westwood One"); William G. Clancy; and Kirk Stirland (collectively, "Defendants"). [Docket No. 43.] For the reasons expressed herein, the Court will grant, in part, and deny, in part, Defendants' Motion.

## I.    FACTUAL BACKGROUND

### A.    Introduction

Plaintiffs Michael Capozzoli and Lee Napier worked for Westwood One as of 2010 and 2013, respectively. [Docket No. 43-1, ¶¶ 33, 41.] Both of them were terminated by Westwood One on November 15, 2018. [*Id.*, ¶ 115.] At that point in time, Capozzoli was 56 years old, and Napier was 65 years old. [Docket No. 50-2, ¶¶ 149, 160.] They allege that Westwood One terminated their employment due to age discrimination.[1]

"Westwood One provides radio stations with content including news media, sports, and radio shows." [Docket No. 43-1, ¶ 1.] One of its divisions was called TM Studios, which "was Westwood One's business line that focused on producing and

---

[1] It is unclear why this case was brought by both Plaintiffs as opposed to as two separate filings, especially given that the facts pertinent to each Plaintiff are different, as would be expected in an employment discrimination case. Although it seems the cases should have been separately filed (and consolidated **only** for discovery purposes), the Court leaves for another day the issues of whether these cases should be severed and whether two separate trials will be necessary.

selling jingles" and where Plaintiffs worked.[2] [*Id.*, ¶ 2.] Defendant Greg Clancy was the General Manager/Vice President of Creative at Westwood One during all relevant times, making him "responsible for general and creative oversight of the business." [*Id.*, ¶¶ 9–10.] Clancy reported to Defendant Kirk Stirland, who was Westwood One's President of Programming during all relevant times. [*Id.*, ¶¶ 10–11.] Melissa Garza was Westwood One's General Counsel in 2018. [*Id.*, ¶ 12.]

Plaintiffs were both affiliate sellers for TM Studios. [*Id.*, ¶¶ 32, 44.] In that role, they would "market and sell" "musical jingles for both the station itself and for advertising clients." [*Id.*, ¶ 14.]

### B.   Quantifying Affiliate Sales

In the radio industry, radio stations rely on selling advertising time in order to make profits. [*Id.*, ¶ 13.] They "also need musical jingles for both the station itself and for advertising clients, which affiliate sellers market and sell." [*Id.*, ¶ 14.] The TM Studios division primarily sold "premade jingles from its existing collection of jingle packages"—accounting for approximately 95% of its sales—although it would also sell some customized jingles. [*Id.*, ¶¶ 20–21.]

---

[2] In 2006, Jones Media purchased TM Studios. [Docket No. 43-1, ¶ 3.] DIAL Global then purchased Jones Media in 2008 or 2009. [*Id.*] "DIAL Global merged with Westwood One and began using Westwood One's name in or around 2011." [*Id.*] Next, in 2013 Defendant Cumulus Media purchased Westwood One. [*Id.*] Finally, on October 30, 2020, Cumulus sold its intellectual property and assets to Major Triad Media, at which point TM Studios ceased to exist. [*Id.*, ¶ 4.]

Measuring the success of radio sales is a somewhat convoluted process. "Radio stations receive Average Quarter Hour ('AQH') ratings based on how many listeners typically tune in during any fifteen-minute block within a set window of time." [*Id.*, ¶ 22.] Those AQH ratings "are converted into Weekly Gross Impressions ('WGIs' or 'GIMPs') by multiplying the number of advertising segments sold by the station's AQH during that timeframe." [*Id.*, ¶ 23.] It follows that "[s]ales made to larger stations produce higher GIMPs because larger stations have higher AQH ratings than smaller stations." [*Id.*, ¶ 24.]

While Capozzoli's compensation package changed multiple times during his employment, [*see* Docket No. 43-1, ¶ 35–38; Docket No. 50-1, ¶ 33, 38; Docket No. 50-2, ¶ 34], Napier's did not, [*see* Docket No. 43-1, ¶ 51]. Under each package, Plaintiffs' success was generally measured by how many GIMPs and deals they were able to create.

**C.    EVO Launch**

In April 2017, Defendant Stirland—Westwood One's President of Programming—launched a new, "updating jingle service called EVO [exclusively] to the TM Studios division." [*Id.*, ¶¶ 52–53.] Although "EVO consisted of Westwood One's pre-packaged jingles," it "expanded the customizability of [those] jingles" both by permitting clients to specify "a desired selection of music and vocal treatment" and by adding monthly updates to the catalog. [*See id.*, ¶¶ 54–56.]

4

Upon EVO's launch and at Stirland's request, Capozzoli and Napier estimated that they would make four or five deals per month on EVO. [*Id.*, ¶ 60.] Plaintiffs dispute this precise calculation, however, as they "included conversions of old customers to the new product and possibly two new deals per month" in their estimations. [Docket No. 50-1, ¶ 60.] The parties agree that Napier told Clancy that Napier and Capozzoli projected 5.5 EVO deals per month, which was 80,000 GIMPs. [*See* Docket No. 43-1, ¶ 62; Docket No. 50-1, ¶ 62; Docket No. 50-2, ¶ 84.] Regardless, the parties agree that any EVO-related sales goals applied only to the TM Studios division, since that was the only Westwood One division that utilized EVO, and that the 80,000 GIMPs goal would not affect Plaintiffs' compensation. [Docket No. 43-1, ¶¶ 61, 63–64.] Nevertheless, Stirland did change Plaintiffs' goal by 1800% from one million GIMPs per year in 2016 to "1.5 million [GIMPs] a quarter on just EVO product both from Mr. Capozzoli and Mr. Napier, in addition to their other goals." [Docket No. 50-2, ¶¶ 85–86.]

### D.   Plaintiffs' Post-EVO Performances

#### 1.   Capozzoli

After the introduction of EVO, Capozzoli "came close to his EVO sales goals—though he failed to achieve them—and received a 'rock star bonus'" of $1,000 for hitting 750,000 AQH in a quarter. [Docket No. 43-1, ¶ 80; Docket No. 50-1, ¶ 80.] He was never placed on a performance improvement plan ("PIP"), and nobody ever made him aware of any sales performance issues in 2017 and 2018.

[Docket No. 43-1, ¶ 81.] Furthermore, Capozzoli "had booked over one million GIMPS in new EVO business." [*Id.*, ¶ 98.]

### 2. Napier

Conversely, in September 2017, Napier "had zero GIMPs for EVO," which prompted Clancy to email him on October 9, 2017, "stating that . . . Napier had not met his goal of 400,000 GIMPs for September of 2017." [*Id.*, ¶¶ 82–83.] Clancy also offered Napier assistance in reaching that goal in the email. [*Id.*, ¶ 84.]

Approximately a month later, on November 10, 2017, Clancy emailed Napier again "regarding his 84,000 GIMPs in new EVO deals, which was approximately 316,000 GIMPs short of his 400,000 GIMPs goal." [*Id.*, ¶ 85.] Napier also had only 3 new affiliate sales, short of the goal of 5.5. [*Id.*, ¶ 86.] This email, too, offered assistance to Napier. [*Id.*, ¶ 89.] Napier responded by reassuring Clancy that he was doing his best and that he and Capozzoli discussed sales strategies together "frequently." [*Id.*, ¶¶ 90–91.] Moreover, the parties dispute whether Capozzoli's sales figures were superior to Napier's during the relevant time period. [*See, e.g.*, Docket No. 43-1, ¶¶ 110–12; Docket No. 50-1, ¶¶ 110–12.]

### E. December 2017 Conference Call

In December 2017,[3] Clancy asked Capozzoli to participate in a conference call with Napier. [*See* Docket No. 50-2, ¶ 100.] Capozzoli testified that in that call,

---

[3] It is unclear from the parties' filings whether this call occurred prior to Napier being placed on a PIP.

Clancy told Capozzoli that Napier "is like an old musician looking for a gig." [*Id.*, ¶ 102.] Clancy denies this. [Docket No. 50-1, ¶ 95.] When Capozzoli asked whether his own job was in jeopardy, Clancy told him it was not. [*Id.*, ¶ 105.] In part because of Clancy's alleged comment, Capozzoli "believe[d] that discrimination had been occurring, and [he] refused [Clancy's] direct order to partake in the call." [Docket No. 50-2, ¶ 104; *see id.*, ¶ 106.] He did not express this sentiment to Clancy, however, instead simply declining to participate in the call. [*See id.*, ¶ 106.]

### F.    Napier Is Placed on PIP, Complains of Age Discrimination

On December, 7, 2017, Napier was placed on a PIP, which indicated that his progress would be reevaluated on January 8, 2018. [Docket No. 43-1, ¶¶ 97, 99.] Napier had no new EVO sales between December 11, 2017, and January 9, 2018, "probably because [he] was on vacation at the end of the year." [*Id.*, ¶ 103.]

Napier testified that at some point "Capozzoli informed him that Mr. Clancy asked Mr. Capozzoli to call Mr. Garza, who would inform Mr. Capozzoli as to what he should be saying to Mr. Napier regarding his performance." [*Id.*, ¶ 108.] This prompted Napier, on January 5, to email Garza and Todd McCarthy—Cumulus' Chief Human Resources Officer—indicating for the first time to anybody other than Capozzoli that he believed he was being discriminated against due to his age. [*See id.*, ¶¶ 100–01, 109; Docket No. 50-1, ¶ 100.] Defendants note that the email did not allude to any comments made by Stirland about hiring younger salespeople. [Docket No. 43-1, ¶ 102.] On January 10, Garza responded to Napier's "complaint of age discrimination, stating in part [that] 'Westwood wholly refutes your allegations of

7

age discrimination. Your managers have the right to establish goals for the business, which they have done and communicated to you. We anticipate you'll work hard to meet them.'" [*Id.*, ¶ 104.] Napier, in turn, responded by alleging that he was being held to a higher standard due to his age and that he was being treated differently than his peers, including Capozzoli. [*Id.*, ¶¶ 105–07.]

As noted above, the parties dispute whether Capozzoli's sales numbers exceeded Napier's during the relevant time period. [*See, e.g.*, *id.*, ¶¶ 110–12; Docket No. 50-1, ¶¶ 110–12.] To the extent that they did, Napier implies that his work was affected by the allegation that "they put [him] through humiliation, aggravation, harassment for months, for the better part of a year." [*See* Docket No. 43-1, ¶ 111.] Regardless, "by June of 2018, . . . Westwood One ceased advising Mr. Napier that his performance was poor." [*Id.*, ¶ 112.] The parties dispute the reason for this change: Defendants contend that it was because "Napier's sales numbers improved," [*id.*], while Napier argues that it was because had been "neck and neck" with Capozzoli through June 2018, [Docket No. 50-1, ¶ 112.]

The parties dispute the extent to which Defendants went in marketing EVO, with Napier testifying that Defendants had indicated they were going to do "this big marketing push," a lot of which Napier claims did not ultimately happen. [Docket No. 50-2, ¶ 82.] Napier testified that he attempted to discuss this lack of marketing with Defendants, but that he "was constantly shut out." [*Id.*, ¶ 83.]

During 2017 and 2018, Westwood One never placed Capozzoli—who never held a supervisory role at Westwood One—on a PIP and never brought to his

attention any issues with his sales performance. [Docket No. 43-1, ¶¶ 39–40.] Defendant Clancy—the General Manager/Vice President of Creative at Westwood One during all relevant times—described Capozzoli as "loved" and told Capozzoli that he sought another salesperson like him. [*Id*, ¶ 41.]

### G.   Allegations of Ageist Comments in 2016 and 2017

Both Plaintiffs allege that Stirland on several occasions indicated a discriminatory, ageist bias. First, both Plaintiffs testified that "[i]n late 2016 and in July 2017, Mr. Stirland stated to Mr. Capozzoli and Mr. Napier that he envisioned TM Studios has having the 'youngest' and 'hippest' salespeople." [Docket No. 50-2, ¶ 55.] Stirland denies making these statements, and Defendants argue that it is not material in any event. [*See id.*, ¶ 58; Docket No. 54, ¶ 55; Docket No. 55, at 3–5.] Napier further testified that Stirland told him that "he was specifically looking for young salespeople" and that "it was important to him that there was a hipness youth factor kind of built into the whole persona." [Docket No. 50-2, ¶¶ 56–57.] Again, Stirland denies making these statements, and Defendants argue that it is not material and that, in any event, it is being misinterpreted: "Mr. Napier recognized that Mr. Stirland was talking about TM Studios' **reputation** when he allegedly used the terms 'old' and 'stodgy' or referenced wanting a 'hipness youth factor.'" [*See id.*, ¶ 58; Docket No. 54, ¶¶ 56–57 (emphasis added); Docket No. 55, at 3–5.] Nevertheless, Stirland admits that "he may have said that their 'desire was to have hipper and more modern-sounding **products**." [Docket No. 50-2, ¶ 59 (emphasis added).]

Napier claims he heard Stirland make these comments "five or six times," which made him "uncomfortable because he was 64 years old and he had no plans to retire." [*Id.*, ¶¶ 60–61.] Both Plaintiffs claim that Stirland repeatedly utilized such language as "old and stodgy and long in the tooth" to describe them, although Defendants argue that Stirland was merely referring to TM Studios' reputation and products. [*See id.*, ¶¶ 64–67, 69–73, 76; Docket No. 54, ¶¶ 64–67, 69–73, 76.]

As noted, in December 2017, Capozzoli contends, Defendant Clancy told Capozzoli that Napier "is like an old musician looking for a gig." [Docket No. 50-2, ¶ 77.] Clancy and Westwood One deny this. [*Id.*, ¶¶ 78–79.] Moreover, Capozzoli testified that he had previously told both Dennis Green—whom Capozzoli described as his business manager at the time—and Debbie Westover—a Contract Manager—that he "thought they were messing with [Napier] because of his age." [*Id.*, ¶¶ 91, 93, 95.] Although it is undisputed that Green and Garza—Westwood One's General Counsel—had a standing weekly meeting during this period, Defendants assert that there is no evidence to suggest that Green notified Garza about Capozzoli's concerns. [*See id.*, ¶ 94.] Further, although Capozzoli apparently believed that Westover reported to Garza, Defendants also deny that Westover ever shared Capozzoli's concerns with Garza. [*See id.*, ¶¶ 95–96.] Instead, Westwood simply told Capozzoli that "she did not think . . . Garza would allow" them to "mess[] with [Napier] because of his age." [*Id.* at 98.]

### H.     Westwood One's Reduction in Force

Westwood One intended to shut down its HitDisc division at the end of 2018. [Docket No. 43-1, ¶ 114.] To coincide with that, it "instituted a planned reduction in force for the TM Studios division." [*Id.*] As a result, Plaintiffs' employment was terminated on November 15, 2018, while some other TM Studios division employees were retained until their termination on December 31, 2018. [*See id.*, ¶ 115.] The parties dispute the rationale behind this decision: Defendants argue that some employees were not fired until December "in order to allow for communication with customers," while Plaintiffs contend that this reason is unsupported by other evidence. [*See id.*; Docket No. 50-1, ¶ 115.] In total, Westwood One terminated the employment of six individuals between November 15 and December 31, 2018. [Docket No. 43-1, ¶ 116.][4]

## II.     PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on April 23, 2020. [Docket No. 1.] The Complaint alleges the following four claims: age discrimination under the Age Discrimination in Employment Act ("ADEA") by Defendants Cumulus Media, Westwood One, and TM Studios (Counts I and II); age discrimination under the New Jersey Law Against Discrimination ("NJLAD") by all Defendants (Count III); and retaliation under the NJLAD by all Defendants (Count IV). [*Id.*] Defendants Clancy, Stirland, and Westwood One (the "moving Defendants") filed the pending

---

[4] The Court explains the circumstances surrounding the reduction in force in further detail below.

Motion for Summary Judgment on August 19, 2021. [Docket No. 43.] After two extensions, Plaintiffs timely filed their opposition on October 18, 2021. [Docket No. 50.] The moving Defendants timely filed their reply on November 1, 2021. [Docket No. 55.] The case was then reassigned to the Honorable Christine P. O'Hearn, who granted Plaintiffs permission to file a sur-reply, which they did on November 19, 2021. [*See* Docket Nos. 58–60.] The case was then reassigned back to this Court on December 28, 2021. [Docket No. 63.]

## III.   JURISDICTION

This Court exercises subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367, as the case's federal claims arise under the ADEA and the state claims "are so related . . . that they form part of the same case or controversy."

## IV.   LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it might impact the "outcome of the suit under the governing law." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. *Id.*

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." *Connection Training Servs. v. City of Phila.*, 358 F. App'x 315, 318 (3d Cir. 2009). "If

12

the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." *Id.*

In the face of a properly supported motion for summary judgment, the non-movant's burden is rigorous. They "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (noting that "speculation and conjecture may not defeat summary judgment") (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

## V.   ANALYSIS

Defendants' Motion seeks summary judgment on all four of Plaintiffs' counts, two of which are for wrongful termination and two of which are for retaliation. [*See* Docket No. 43-2, at 14–30.] Under the NJLAD, it is unlawful for an employer to terminate its employees because of their age. N.J. STAT. ANN. § 10:5-12(a). "In a case alleging age discrimination under the LAD, an employee must 'show that the prohibited consideration[, age,] played a role in the decision making process and that it had a determinative influence on the outcome of that process.'" *Bergen Commer. Bank v. Sisler*, 157 N.J. 188, 207 (1999) (quoting *Maiorino v. Schering-Plough Corp.*, 302 N.J. Super. 323, 344 (App. Div. 1997)) (alteration in original).

Meanwhile, the ADEA precludes employers from terminating or otherwise discriminating "against any individual" who is at least 40 years old "with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's age." *See* 29 U.S.C. § 623(a)(1). To succeed under the ADEA, an employee must prove that their membership in a protected class actually motivated or had a determinative influence on an adverse employment decision. *See Fasold v. Justice*, 409 F.3d 178, 183–84 (3d Cir. 2005).

"Age discrimination claims under the LAD and the ADEA are governed by the same standards and burden of proof structures applicable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq." *Waldron v. SL Indus.*, 849 F. Supp. 996, 1000 (D.N.J. 1994), *rev'd on other grounds*. Therefore, courts consider "LAD and ADEA claims together." *Id.* Moreover, in analyzing age discrimination claims, courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 241 (3d Cir. 2007). Under that framework, the burden is initially on the plaintiff to establish a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. If the plaintiff can establish a *prima facie* case, then the burden shifts the defendant "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's termination. *Id.* Finally, if the defendant can point to such a reason, the burden shifts back to the plaintiff to show that the defendant's purported legitimate, nondiscriminatory reason is pretextual. *Id.* at 805.

Here, the Court will first address Counts I and III, which allege wrongful termination, before turning to Counts II and IV, which allege retaliation. [*See* Docket No. 1, ¶¶ 81–113.]

### A.     Napier's NJLAD Claims

As a preliminary matter, Napier's NJLAD claims will not survive this Motion. Defendants argue that Napier is not entitled to relief under the NJLAD because "Westwood is a Delaware corporation with its corporate headquarters located in New York" and "at all relevant times, Mr. Napier resided in an continues to reside in South Carolina." [Docket No. 43-2, at 21 (citing Docket No. 1, ¶ 7).] Napier does not dispute that he "never worked in New Jersey during" the relevant time period. [*See* Docket No. 43-1, ¶ 46; Docket No. 50-1, ¶ 46.] Nor does he respond to Defendants' argument that he is not entitled to relief under the NJLAD. [*See generally* Docket No. 50.]

"New Jersey courts have consistently applied the law of the state of employment to claims of workplace discrimination and, therefore, only apply the NJLAD if the claimant was employed in New Jersey." *McGovern v. Sw. Airlines*, No. 12-3579, 2013 U.S. Dist. LEXIS 3095, at *1 (D.N.J. Jan. 8, 2013) (Simandle, C.J.); *see also Walters v. Safelite Fulfillment, Inc.*, No. 18-11111, 2019 U.S. Dist. LEXIS 52355, at *5–10 (collecting cases discussing the NJLAD's applicability to out-of-state employees). Because Plaintiffs make no argument that Napier was employed in New

Jersey, the Court will grant summary judgment in Defendants favor on Napier's NJLAD claims.[5]

### B.   Counts I and III—Unlawful Termination

#### 1.   Plaintiffs' *prima facie* case

As noted above, Plaintiffs must first establish a *prima facie* case under *McDonnell Douglas*. Here, a *prima facie* case requires Plaintiffs to show that: (1) they are members of a protected class (i.e., they are more than forty years old); (2) they were "qualified for the position[s] in question"; (3) they "suffered an adverse employment decision"; and (4) "the position was filled by someone sufficiently younger to permit an inference of age discrimination." *See Jackson v. Trump Entertainment Resorts, Inc.*, 149 F. Supp. 3d 502, 510 (D.N.J. 2015) (applying the ADEA).[6]

---

[5] Resultingly, the remainder of this Opinion analyzes both NJLAD and ADEA for Capozzoli's claims, but only the ADEA for Napier's claims. However, because the NJLAD and ADEA are analyzed coextensively, the Court's discussion of Napier's ADEA claims would be identical to its discussion of his NJLAD claims, if Napier were otherwise entitled to relief under the NJLAD.

[6] Under the NJLAD, the fourth element requires that there exists "a logical basis on which to find that [the defendant's] decision to terminate [the plaintiff] was affected significantly by her age." *Arenas v. L'Oreal United States Prods., Inc.*, 790 F. Supp. 2d 230, 236 (D.N.J. 2011). Nevertheless, because claims under the NJLAD and ADEA are analyzed co-extensively, this slight linguistic discrepancy does not affect the Court's analysis. *See Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 304, 306 (3d Cir. 2004) ("Overall we are satisfied that we should apply the same standard for the fourth element of [an age discrimination] *prima facie* case under the NJLAD as we would have applied under the ADEA . . . .").

It is undisputed that Plaintiffs satisfy the first three elements of a *prima facie* case. [*See* Docket No. 43-2, at 14–30 (only arguing about the fourth element).] However, Defendants argue that Plaintiffs fail to satisfy the fourth element of a *prima facie* wrongful termination age discrimination claim. [*Id.* at 16-21.]

Importantly, in the context of a case in which the plaintiff was terminated as a result of a reduction in force, "in order to satisfy the fourth element of a *prima facie* case . . . , the plaintiff must show that the employer retained a sufficiently younger similarly situated employee." *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 301 (3d Cir. 2004). "However, an individual does not need to be situated **identically** to satisfy the fourth element of a plaintiff's *prima facie* case . . . ." *Monaco*, 359 F.3d at 305. "In order to determine who might qualify as a similarly situated employee we must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace." *Id.*; *see also Jackson*, 149 F. Supp. 3d at 511 ("An employee is 'similarly situated' when the evidence supports a claim that the plaintiff and a retained employee shared comparable duties.").

Here, Defendants argue that Plaintiffs' employment was terminated as a result of a reduction in force in late 2018. [*See* Docket No. 43-1, ¶¶ 114–43.] Napier was 65 years old at the time, and Capozzoli was 56. [Docket No. 50-2, ¶¶ 149, 160.] Four other individuals were terminated from TM Studios as a result of the reduction in force between November and December 2018. [*See* Docket No. 43-1, ¶ 116.] Those four individuals were 62, 55, 46, and 37 years old, respectively. [*See id.*] Moreover,

**all** TM Studios affiliate sellers—including one who was 37 years old—were terminated as a result of the reduction in force. [*See* Docket No. 43-2, at 17.]

Nevertheless, to hold that **only** other TM Studios sellers could be considered "similarly situated" to Plaintiffs would be overly restrictive; after all, the Court must make all reasonable inferences in Plaintiffs' favors at this stage, and Third Circuit precedent has explicitly stated that "there is a low bar for establishing a *prima facie* case of employment discrimination." *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006). A jury might agree with Plaintiffs, who point out that they were more broadly members of Westwood One's Affiliate Sales Team, not just TM Studios, [Docket No. 50, at 7], and that several other affiliate sellers were retained after the reduction in force, including six who were 25, 28, 34, 40, 41, and 49 years old, respectively.[7] [Docket No. 50-2, ¶ 169.] Defendants argue that those sellers are not "similarly situated" to Plaintiffs because they "performed affiliate sales duties in other divisions of the company . . . [,] often had different titles, sold different products, and reported to supervisors other than Mr. Clancy." [Docket No. 54, ¶ 169.] Even in spite of those differences, the Court finds that Plaintiff has satisfied the low burden of establishing by a preponderance of the

---

[7] Plaintiffs also argue that five of the nine TM Studios employees who were retained after the reduction in force were under the age of 45. [Docket No. 50, at 8.] However, Plaintiffs make no argument that these individuals were similarly situated to Plaintiffs, other than insofar as they worked for TM Studios. Therefore, the Court will not rely on those statistics deciding Defendants' Motion for Summary Judgment.

evidence that Defendants retained "sufficiently younger similarly situated employee[s]." *See Monaco*, 359 F.3d at 301. It appears that the employees in question had similar job functions and levels of supervisory responsibility, among other things. *See id.* While this is ultimately a jury question, Plaintiffs have satisfied their burden at this stage. Therefore, the Court finds that Plaintiffs have stated a *prima facie* case, as the first *McDonnell Douglas* step requires.[8]

### 2. Defendants' legitimate, nondiscriminatory reason

Since Plaintiffs' have met their burden of establishing a *prima facie* case, the burden shifts to Defendants to proffer a legitimate, nondiscriminatory reason for having terminated Plaintiffs' employment. *See McDonnell Douglas*, 411 U.S. at 802. Due to the unique nature of the *McDonnell Douglas* burden-shifting framework in reduction-in-force cases, Defendants' proffered legitimate, nondiscriminatory reason is duplicative of their argument as to why Plaintiffs cannot satisfy the fourth element of the *prima facie* case. In other words, Defendants' proffered legitimate, nondiscriminatory reason is that Plaintiffs were terminated due to a reduction in force. The Court concludes that this reason satisfies Defendants' burden. *See, e.g.,*

---

[8] Plaintiffs also argue that, while there was a reduction in force, they were not a part of it. [*See* Docket No. 50-4, at 180:5–6.] In his deposition, Capozzoli listed three reasons for doubting that Plaintiffs were fired as part of the reduction in force: (1) Defendants' alleged discriminatory comments in 2016 and 2017; (2) the fact that Plaintiffs were "let go immediately" and the other four individuals were permitted to continue working for approximately six more weeks; and (3) the fact that Plaintiffs were given "higher goals . . . than anyone else who worked for affiliate sales." [Docket No. 50-4, at 179:3–19.] The Court finds this argument to be tenuous, but ultimately concludes that it need not address it at this stage.

*Saunders v. Southeastern Home Health Servs. of Pa., LLC*, 2021 U.S. Dist. LEXIS 62425, at *13–14 (E.D. Pa. Mar. 31, 2021) (deeming a reduction in force to be a legitimate, nondiscriminatory reason for an adverse employment action).

### 3.    Plaintiffs' evidence of pretext

Finally, the burden shifts back to Plaintiffs to show "by a preponderance of the evidence that" Defendants' legitimate, nondiscriminatory reason "is pretextual." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). To do so, they "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

### i.    Alleged ageist statements

Both plaintiffs make several arguments in this regard.[9] First, they argue that "Defendants' decisionmakers [made] several ageist statements about Plaintiffs" prior to their termination. [Docket No. 50, at 10–14 (cleaned up).] Specifically, they point to statements allegedly made by Defendant Stirland in late 2016 and July 2017 "that he envisioned TM Studios as having the 'youngest' and 'hippest' salespeople" and that the TM Studios "persona" have a "hipness youth factor kind of built in." [*Id.* at 10.] Napier alleges that he heard Stirland make these comments "five or six times."

---

[9] In addition to those addressed below, Plaintiffs also argue that Defendants retained "similarly situated affiliate sales representatives" in spite of the reduction in force. [*Id.* at 14.] The Court has already addressed this argument above.

[*Id.* at 11.] Plaintiffs further allege that Stirland referred to them as "long in the tooth," "culturally out of sync," and "old and stodgy," again approximately five or six times. [*Id.*] Finally, Capozzoli claims that in December 2017, Defendant Clancy told Capozzoli that Napier "is like an old musician looking for a gig," [*id*], which Capozzoli shared with Napier, [Docket No. 43-3, Exhibit D, at 154:19–22.]

Defendants argue that these alleged statements are merely "stray remarks unconnected in time and context to Plaintiffs' terminations." [*See* Docket No. 43-2, at 18–19.] Specifically, they argue that these comments were misconstrued by Plaintiffs, had nothing to do with the decision-making process, and were temporally distant from the decision to implement a reduction in force. [*See id.*]

The Court disagrees with Defendants' arguments for the purposes of this Motion. Although it will ultimately come down to the jury's weighing of the evidence, Plaintiffs have presented sufficient evidence at this stage to show that Defendants' comments were not merely "stray remarks" and to support an inference of pretext.

### ii.        Hiring of Chris Stevens

Next, Plaintiffs argue that Defendants hired 43-year-old Chris Stevens[10] as their replacement less than two months after firing them. [*Id.* at 14–18.] The parties dispute this assertion—Stevens was hired in January 2019 for a Vice President/Affiliate Management position, which has at least ostensibly distinct job

---

[10] Plaintiffs also refer to Stevens as William C. Mossay. [Docket No. 50, at 15.]

responsibilities from Plaintiffs' jobs, such as that it is being a management role. [*See* Docket No. 55, at 6–9.] Additionally, Defendants point to evidence that Capozzoli would not have been qualified for or even interested in the position, especially given its location. [*See id.*] Plaintiffs have presented evidence that raises questions as to when Defendants began to negotiate with Stevens to return, how similar his job responsibilities are to Plaintiffs', the extent of the changes in Defendants' business model after the reduction in force, and the legitimacy Defendants' explanation for not offering this role to either of Plaintiffs, among other things. [*See* Docket No. 50, at 14–20.] However, there appears to be no dispute that Stevens' role was not identical to Plaintiffs', particularly that there were "a lot more managerial aspect[s]" to Stevens' role. [*See id.*, at 8.] As another court in this Circuit has held, hiring a new employee generally does not constitute replacing the fired employee when the new "employee is assigned to perform the plaintiff's duties **in addition to other duties**, or when the work is redistributed among other existing employees performing related work." *Michniewicz v. Metasource, LLC*, 756 F. Supp. 2d 657, 666 (E.D. Pa. 2010). Therefore, the Court concludes that the hiring of Stevens is not evidence of pretext in this matter.

### iii.      Failure to investigate claims of discrimination

Finally, Plaintiffs argue that Defendants' alleged failure to investigate Plaintiffs' allegations of discrimination indicates pretext. [*Id.* at 20–22.] Plaintiffs point to Tenth Circuit precedent that held that a "failure to conduct what appeared

22

to be a fair investigation of the violation that purportedly prompted adverse action **may** support an inference of pretext." *DeWitt v. Southwestern Bell Telephone Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017) (emphasis added). Here, however, the alleged failure to investigate does not support an inference of pretext with respect to Plaintiffs' wrongful termination claims, particularly given that Defendants did conduct an investigation and, though it was allegedly insufficient, it occurred at least nine months before Plaintiffs were terminated. The Court further finds that the other cases cited by Plaintiffs are inapposite and do not bear on this ruling.

### iv.     Conclusion

In light of the above, the Court finds that Plaintiffs have presented sufficient evidence, albeit barely, for a reasonable jury to find by a preponderance of the evidence that Defendants' proffered legitimate, nondiscriminatory reason for terminating Plaintiffs—that is, the reduction in force—is pretextual. As such, the Court will deny Defendants' Motion with respect to Counts I and III.[11]

### C.     Counts II and IV—Retaliation

In order to make out a *prima facie* case of retaliation under the NJLAD and the ADEA, a plaintiff must show that: (1) he engaged in a protected activity of which the employer was aware; (2) he suffered an adverse action after or contemporaneous with the protected activity; and (3) a causal connection exists between the protected

---

[11] Defendants argue that Capozzoli's affidavit is a sham affidavit. [Docket No. 55, at 5–6.] The Court does not rely on Capozzoli's affidavit in making this ruling, so it need not address the issue of whether it was a sham affidavit at this time.

activity and the adverse action. *See Michaels v. BJ's Wholesale Club, Inc.*, 604 F. App'x 180, 182 (3d Cir. 2015) (NJLAD); *Culler v. Sec'y of United States Veterans Affairs*, 507 F. App'x 246, 250 (3d Cir. 2012) (ADEA). As above, retaliation claims are analyzed under the *McDonnell Douglas* framework. *Deville v. Givaudan Fragrances Corp.*, 419 F. App'x 201, 205 (3d Cir. 2011).

### 1.    Plaintiffs' *prima facie* case

#### i.    Did Capozzoli engage in protected activity?

Defendants argue that Capozzoli fails to satisfy the first and third elements of the *prima facie* case and that Napier fails to satisfy the third element. [Docket No. 43-2, at 22–27.] "The Third Circuit has described engaging in a protected activity as 'opposing any practice made unlawful' by the ADEA." *Ayres v. MAFCO Worldwide LLC*, No. 18-12071, 2020 U.S. Dist. LEXIS 130131, at *16 (D.N.J. July 23, 2020) (quoting *Barber v. SCX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)). "[O]pposition to an illegal employment practice must identify the employer and the practice—if not specifically, at least by context. . . . [I]t must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (citing *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012–13 (9th Cir. 1983)).

Capozzoli alleges that he engaged in protected activity in either August or September 2017, when he "told both Dennis Green, his business manager, and

Debbie Westover, a Contract Manager, that he 'thought they were messing with [Napier] because of his age.'" [Docket No. 50, at 23.] He also allegedly notified them at this time that he had referred Napier to an employment attorney. [*Id.*] Separately, in December 2017, he refused to take part in a call with Napier. [*Id.* at 23–24.] It is clear from Capozzoli's first alleged statement that he was opposing alleged discrimination against Napier. Therefore, that statement constitutes protected activity, as he was explicitly opposing Defendants' allegedly discriminatory actions. However, Capozzoli's December 2017 refusal to join the call with Napier and Clancy neither specifically nor contextually made it "possible to discern . . . that [Capozzoli] oppose[d] an unlawful employment practice." *Curay-Cramer*, 450 F.3d at 135. The most Capozzoli alleges about that call is that Clancy said that Napier "is like an old musician looking for a gig," which prompted Capozzoli to *internally* believe that discrimination was occurring. [*See* Docket No. 50, at 24.] While Capozzoli did tell **Napier** about this comment, [*see* Docket No. 43-3, Exhibit D, at 154:19–22], he never expressed to Clancy or anybody else that he felt it reflected ongoing discrimination. [*See* Docket No. 50, at 24.] Rather, Capozzoli merely asked Clancy if his job was in jeopardy and, once assured that it was not, declined to participate in the call. [*See id.*] This Court finds as a matter of law that this is insufficient to constitute protected activity.

ii.      Was there a causal connection between Plaintiffs'
protected activities and their terminations?

Nevertheless, because Capozzoli's alleged comments to Green and Westover are sufficient to satisfy the first *prima facie* element, the question for his claim becomes whether a causal connection exists between that comment and Capozzoli's termination. Similarly, the only issue that the parties dispute with respect to Napier's claim is whether there a causal connection exists between his complaint of age discrimination in January 2018—which the parties agree is protected activity—and his termination.

Third Circuit precedent "has focused on two main factors in finding the causal link necessary for [ADEA] retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Patterson College*, 260 F.3d 265, 288 (3d Cir. 2000) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). But a court's review is not limited to those factors and may consider "additional evidence to prove the causal nexus," including circumstantial evidence and "discrepancies in the proffered reasons" for the termination. *See id.* at 288–89. However, the Third Circuit has also held that a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (2015).

In this case, Capozzoli cannot establish a causal connection because he has presented no evidence showing that the decisionmakers—Clancy and Stirland—were

ever made aware of his comments to Westover and Green. Plaintiffs' argument regarding this issue is that "[s]ince Mr. Capozzoli complained to his direct business manager, there is an inference that Defendants knew of Mr. Capozzoli's complaints." [Docket No. 50, at 23.] Plaintiffs offer no legal support for this argument. Nor do they offer any other evidence to suggest that the decisionmakers were aware of Capozzoli's comment. In fact, Plaintiffs' own argument relies, in part, on the fact that "[t]here is no record evidence that Defendants investigated Mr. Capozzoli's verbal complaints to Mr. Green and Ms. Westover." [*Id.* at 20.] The Court therefore finds that Capozzoli has failed to establish the third *prima facie* element and, as a result, his retaliation claims fail.

The decisionmakers were aware of Napier's complaint, however. Napier does not argue that the temporal proximity between his protected activity and his termination is suggestive of retaliation. [*See id.*, at 28–31.] Instead, Napier points to the following pieces of circumstantial evidence: (1) the fact that Defendants kept him on a performance improvement plan for "several months" after he made his complaint and (2) Defendants' allegedly ageist comments and discrepancies in their proffered explanation for Plaintiffs' terminations. [*See id.* at 29–31.] Of course, he was already on a PIP prior to making his complaint.

The Court has already ruled, above, that Plaintiffs have "succeeded in both casting doubt on the reasons [Defendants] proffered for [their] termination[s], and in demonstrating that those reasons were vague and inconsistent." *See Abramson*, 260 F.3d at 289. In *Abramson*, that, "coupled with" both temporal proximity and "the

27

'ongoing antagonism' reflected in the record," constituted sufficient "proof of a causal connection" to establish the third prong the *prima facie* case. *Id.* It is important to note several differences between this case and *Abramson*, however. First, unlike in this case, in *Abramson* there was arguably a temporal connection since the protected activity occurred merely twelve days before the adverse employment decision. *See id.* at 288. Second, the behavior complained of in *Abramson* was far more severe than here. In *Abramson*, the employers repeatedly criticized the plaintiff's religious beliefs, used derogatory language in referring to the plaintiff, and intentionally attempted to schedule events that interfered with the plaintiff's religious practices. *See id.* at 267–73. Conversely, Napier complains that he was required to remain on a PIP on which he had already been placed before his protected activity. These distinctions illustrate the weakness of Napier's retaliation claim—there is no temporal connection and his evidence of "ongoing antagonism" is incredibly meager. Therefore, the Court finds that Napier's retaliation claim fails as well.

## VI.   CONCLUSION

For the reasons outlined herein, the Court will grant, in part, and deny, in part, Defendants' Motion for Summary Judgment. [Docket No. 43.] An accompanying Order shall issue.


March 28, 2022                                      s/Renée Marie Bumb
Date                                                        Renée Marie Bumb
                                                               United States District Judge